[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1158 
 ON APPLICATION FOR REHEARING
This Court's opinion of December 18, 1992, is hereby withdrawn and the following is substituted therefor.
Ganus Gray sued Liberty National Life Insurance Company ("Liberty National"), alleging that the company had fraudulently withdrawn money from his bank account to pay the premiums on a life insurance policy he had not purchased.[1] Gray also alleged claims for conversion, trespass to a bank account, and the tort of outrage. Liberty National filed a motion for summary judgment. After a hearing on the motion, the trial court determined that the fraud claim was barred by the statute of limitations and that Gray had failed to support his conversion and outrage claims with substantial evidence. The court entered a summary judgment for Liberty National on those three claims. The court did not resolve the issue of trespass, but made the summary judgment final pursuant to Rule 54(b), Ala.R.Civ.P. Gray appeals.
A summary judgment is proper and must be affirmed on appeal if there is no genuine issue of material fact and that moving party is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P; Lee v. City of Gadsden, 592 So.2d 1036 (Ala. 1992). If the moving party makes a prima facie showing that no genuine issue of material fact exists, then the burden shifts to the nonmovant to present substantial evidence in support of his position. Lee.
We begin by noting these facts from the record: Gray began buying various insurance policies from Liberty National in 1944. In 1963, Gray authorized Liberty National to draft his bank account in order to pay itself for premiums due on the policies. Gray executed an "Authorization to Honor Checks Drawn By Liberty National Life Insurance Company, Birmingham, Alabama," as well as a "Request for Bank Budget Premium Check Plan." Liberty National thereafter sent a letter to Gray and his bank, notifying them that the company would begin drafting the account for the amount of the premiums. Gray bought additional policies at different times and re-executed the automatic bank draft forms. Liberty National then sent him notice letters to inform him that the authorized drafts would begin. Liberty National thereafter withdrew the amount of the premiums from his account each month by executing a draft instrument for the proper amount. The bank recorded the withdrawal on Gray's bank statement and sent him the separate draft instrument along with his other canceled checks each month.
In 1977, Gray's son Jeffery graduated from high school and began college. During a Christmas vacation, a Liberty National agent talked to Jeffery about life insurance. Jeffery *Page 1159 
signed an application for a policy and paid the initial premium to the agent. The agent's report, which he filed along with Jeffery's application, stated that a "Bank Budget Card will be forwarded later."
Neither Jeffery nor his father ever received any documents from Liberty National concerning the policy. In January 1978, however, Liberty National began to withdraw $10.86 from Ganus Gray's bank account each month to pay for Jeffery's policy. Jeffery did not authorize this action, and his father did not know the policy existed. Liberty National did not send a letter of notice to Gray, but continued to withdraw $10.86 per month from his account for the next 12 years, adding this amount to Gray's existing monthly premium of $18.75. Liberty National did not issue a separate draft instrument for the new policy; rather, it merely increased the amount on the single draft instrument by $10.86.
In March 1990, Gray retired from work and stopped all automatic drafts on his bank account. Thereafter, Liberty National sent a letter of notice addressed to Jeffery, informing him that his policy was about to lapse for delinquent premiums and that Liberty National itself had been paying the premiums each month since March under an "automatic loan receipt" provision contained in the policy. In July 1990, Jeffery sent a letter to Liberty National, stating that he had never received the policy he applied for and that he had not authorized payment for the policy through his father's bank account. In response, Liberty National returned his initial premium of $10.86 that he had paid with his application in 1977. The company sent a check to Ganus Gray in the amount of $1,681.35, which represented $1,585.56 in premiums and $95.79 in interest (6%). Gray requested another 6% interest, and Liberty National complied. He thereafter filed this action.
Gray first argues that the trial court erred in determining that his claim for fraudulent misrepresentation was barred by the statute of limitations. At the time the alleged misrepresentation began in 1978, a claim for fraud was subject to a one-year statute of limitations. Ala. Code 1975, former § 6-2-39. Effective January 9, 1985, the Alabama legislature amended § 6-2-3 and repealed § 6-2-39. Lader v. Lowder RealtyBetter Homes Gardens, 512 So.2d 1331 (Ala. 1987). This change placed fraud actions within § 6-2-38, which provides for a two-year period of limitations; actions that had been barred as of January 9, 1985, by the one-year statute of limitations were not revived by the transfer of fraud actions to the two-year statute or by the corresponding amendment to § 6-2-3. Lader.
Under § 6-2-3, a fraud claim accrues at the time of the discovery by the aggrieved party of the fact constituting the fraud. Lader. The time of discovery of a fraud claim is the time when the party actually discovered the fraud or had facts that, upon closer examination, would have led to the discovery of the fraud. Lader. "[F]raud is discovered as a matter of law . . . when one receives documents that would put one on such notice that the fraud reasonably should be discovered." Hickoxv. Stover, 551 So.2d 259, 262 (Ala. 1989).
It is undisputed that Gray received bank statements as early as January 1978 that clearly showed that Liberty National was withdrawing an additional $10.86 per month. He also received copies of the actual draft instrument, showing the increase in the amount of premiums and the number of policies. In March 1978, the increased Liberty National withdrawal actually caused an overdraft of Gray's account, for which he paid a fee to the bank. For the next 12 years, Gray continued to receive detailed bank statements that, upon a cursory examination, would have revealed that Liberty National was withdrawing premiums for an additional policy. He also continued to receive canceled drafts for this amount. The record shows that Gray is literate and that he was capable of managing his affairs throughout this 12-year period. Based on these facts, we must conclude that a reasonable person of ordinary prudence would have discovered the alleged fraud in 1978 or within one year thereafter. Accordingly, we find no error in the trial court's entry of the summary judgment as to this claim, based upon the statute of limitations. *Page 1160 
The next issue raised is whether the trial court erred in entering the summary judgment as to Gray's claim of conversion. To constitute conversion, there must be a wrongful taking, an illegal assumption of ownership, or an illegal use or misuse of another's property. Gillis v. Benefit Trust Life Ins. Co.,601 So.2d 951 (Ala. 1992). An action alleging conversion of cash lies only where the money involved is "earmarked" or is specific money capable of identification, e.g., money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered, and where there is an obligation to keep intact and deliver this specific money rather than to merely deliver a certain sum. Gillis. InGillis, this Court determined that money received by use of pre-authorized checks drawn monthly by an insurer against the insured's checking account to cover premiums for a specific insurance policy is "identifiable" for purposes of maintaining a claim for conversion. In view of Gillis, we hold that the money paid on the pre-authorized checks Liberty National drew monthly against Gray's bank account was "identifiable" money; thus, Gray may maintain an action for conversion here. The record reveals substantial evidence to establish the elements of the claim; accordingly, the summary judgment is reversed as to the conversion claim and the cause is remanded for further proceedings on that claim.
Gray next argues that the trial court erred in entering the summary judgment for Liberty National on his claim alleging the tort of outrage. In order to sustain this claim, Gray must establish by substantial evidence that Liberty National, by extreme and outrageous conduct, intentionally or recklessly caused him severe emotional distress. American Road Service Co.v. Inmon, 394 So.2d 361 (Ala. 1980). "Extreme conduct" is defined as "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Inmon, 394 So.2d at 365. The extreme conduct must result in emotional distress "so severe that no reasonable person could be expected to endure it." Id. Mere annoyances or indignities are not enough to make a defendant liable for extreme and outrageous conduct. Barrett v. Farmers Merchants Bank, 451 So.2d 257 (Ala. 1984).
In deposition testimony, representatives of Liberty National testified that the company's withdrawals for Jeffery's policy were made because of an inadvertent mistake and that the company repaid the amount with interest as soon as it discovered the error. Gray produced no substantial evidence to rebut this testimony and to establish that Liberty National's conduct went beyond the bounds of decency. Moreover, Gray did not present substantial evidence to establish that Liberty National's error caused him any extreme emotional distress. In view of this, the trial court properly concluded that Liberty National was entitled to a judgment as a matter of law on the outrage claim.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATIONGRANTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MADDOX, ADAMS, HOUSTON, KENNEDY and INGRAM, JJ., concur.
HORNSBY, C.J., and ALMON, J., concur in part and dissent in part.
SHORES, J., recused.
[1] Gray did not sue the bank.