781 So.2d 197 (2000)
Matthew COX et al.
v.
Alice Gearlene Plier HUGHES et al.
1981934.
Supreme Court of Alabama.
September 22, 2000.
*198 William P. Powers III, Columbiana, for appellants.
Thomas T. Gallion III and Jamie A. Johnston of Haskell, Slaughter, Young & Gallion, L.L.C., Montgomery, for appellees.

On Application for Rehearing
COOK, Justice.
The opinion of June 30, 2000, is withdrawn, and the following is substituted therefor.
Ray Cox, Karen Cox, and Matthew Cox appeal from an adverse summary judgment in their action seeking to set aside conveyances they alleged to be fraudulent. We affirm in part; reverse in part; and remand.
This action involves an attempt by the Coxes to collect a $629,000 default judgment entered against Alice Gearlene Hughes in an earlier case. That judgment had been affirmed by this Court in Hughes v. Cox, 601 So.2d 465 (Ala.1992). To aid the reader in understanding this case, we *199 shall repeat here the pertinent facts as they were set forth in Hughes:
"In January 1986, Ray and Karen Cox purchased a house from Thomas and Judith Duke. Hughes Realty Company was the selling agent, and City Finance of Clanton financed the purchase for the Coxes. The Coxes moved into the house in February 1986 and, around June 1986, noticed standing water outside the house. The Coxes contacted a man to come to the house and clean out the septic tank; however, when the man attempted to pump out the tank, he discovered that there was, in fact, no septic tank. Instead, a 500-gallon gasoline tank had been buried in the ground. The top of the tank had rusted and water was bubbling out of the top onto the ground.
"The Coxes then discovered a large accumulation of liquid under the house. The liquid was raw sewage, and it had been seeping from under the house into their house through the walls. The man who had come to the house to clean the tank told the Coxes that the land on which their house was situated would not percolate and that, therefore, a septic tank could not be installed. There was also no sewage system, because the house was located in a rural area of Chilton County.
"The Coxes and their one-year-old son, Matthew, began developing boils on their skin while living in the house, and they continued to develop these boils after leaving the house. Mrs. Cox was pregnant at the time the boils started to develop, and the child of this pregnancy, born after the Coxes had moved out of the house, also developed the same type of boils. After seeking medical attention, the Coxes were told by their doctor that an infection of staphylococcus aureus (staph) was causing the boils on their skin. The Coxes were treated with antibiotics, and the doctor advised them to clean everything in the house with bleach. They followed the doctor's instructions; however, the boils continued. The doctor then advised them to move out of the house because he thought it very likely that the raw sewage was causing their staph infections. The Coxes left the house in June 1986 and have made no payments on the note since that time.
"On October 10, 1986, the Coxes, individually and on behalf of their son Matthew, filed a complaint against City Finance, the Dukes, and `Hughes Realty of Clanton, Alabama.' The complaint alleged negligence, wantonness, and fraud and misrepresentation with regard to the condition of the house, the condition of the soil as to whether it would percolate, and the existence of a septic tank. City Finance counterclaimed, but, after discovery and negotiations, both the claim against it and its counterclaim were dismissed by agreement of the parties. In January 1990, the claims against the Dukes were also dismissed by consent of the parties, and `Hughes Realty of Clanton, Alabama,' remained as the only defendant.
"The Coxes moved for an entry of default against Hughes Realty and, on April 3, 1990, the circuit court entered a default and scheduled a hearing on damages. The court held that hearing on May 3 and entered the following on the case action summary sheet:
"`Plaintiffs present with attorney, hearing on damages on default. Defendant['s] name amended to conform to proof & since service was had on Geraldine [sic] Hughes to reflect Defendant, Geraldine [sic] Hughes, d/b/a Hughes Realty Company. Oral order entered. Written judgment to follow.'

*200 "On June 27, 1990, the Coxes amended their complaint and substituted `Gearlene Hughes, d/b/a Hughes Realty or Hughes Realty of Clanton' for `Hughes Realty of Clanton, Alabama' as the defendant.... The court entered a default judgment against [Gearlene] Hughes on September 14, 1990, awarding $4,000 compensatory damages to Matthew Cox, through his father; $100,000 compensatory and $175,000 punitive damages to Ray Cox; and $150,000 compensatory and $200,000 punitive damages to Karen Cox.
"On September 20, 1990, Hughes filed a motion to set aside the default judgment. On November 1, the trial court held a hearing on that motion and, on December 21, 1990, entered an order denying it."
601 So.2d at 466-67 (footnotes omitted). This Court affirmed that order. Id. at 473.
The Brief of Appellees offers the following additional information regarding the businesses and relationships involved in this dispute:
"Oscar Plier, Ollie Mae Plier and Gearlene Hughes began working together in the construction business in 1961. After the death of Gearlene Hughes's husband, Wylie Jones, Jr., in 1960, Oscar Plier and Gearlene Hughes (then Gearlene Jones) started a construction business, Plier & Jones Contractors. After Mr. James Conrad Hughes and Ms. Gearlene Hughes were married, the name of the business was changed to Plier & Hughes Contractors.
"Plier-Hughes, Inc. was incorporated on August 16, 1974, to engage in the real estate business; i.e., selling, rental and construction. The original incorporators of the company were Oscar Plier, Ollie Mae Plier and Gearlene Hughes. The original officers and directors of the company were Gearlene Hughes, President; Oscar B. Plier, Vice President; and Ollie Mae Plier, secretary/treasurer."
Brief of Appellees, at vi (citations to the record omitted).
On October 25, 1995, the Coxes filed a complaint against Alice Gearlene Hughes, individually, and Alice Gearlene Hughes d/b/a Plier-Hughes, Inc. Throughout the record and the briefs, this corporation is variously called Plier-Hughes, Inc., and Plier & Hughes, Inc. For the sake of consistency, we shall hereinafter refer to it as Plier-Hughes, Inc. Also named as defendants were Oscar B. Plier, Ollie M. Plier, and Tabitha Hughes. The complaint, which was styled as a "Petition to Set Aside Fraudulent Conveyances and Transfers and Declaratory Judgment," alleged that the Coxes are "judgment creditors of the Defendant, Gearlene Hughes d/b/a Hughes Realty and Hughes Realty of Clanton," and that "Oscar B. Plier, Ollie M. Plier and Tabitha Hughes, who are the father, mother, and daughter [respectively] of ... Gearlene Hughes, ... are the persons to who[m] the defendant, Alice Gearlene Hughes, fraudulently transferred and conveyed personal property, stock in Plier-Hughes, Inc., and real property." The complaint alleged that the transfers were "fraudulent in nature, and designed to evade creditors." It also sought a judgment "set[ting] aside" and "[holding] for naught" all such "conveyances and transfers." The Coxes also sought to pierce the corporate veil. The defendants moved for a summary judgment, which the trial court granted, and the Coxes appealed.
On appeal, the Coxes address only one transaction that they have alleged to be fraudulent. Specifically, they challenge a transaction that was evidenced by a handwritten document, dated November 7, 1984, by which Hughes purported to *201 transfer 50 shares of stock in Plier-Hughes, Inc.her entire ownership interest in the corporationto her father and mother. The Coxes allege that this transaction was fraudulent. In other words, they contend that this transaction was merely an attempt by Hughes to avoid the collection of their $629,000 judgment against her. The dispositive issue on appeal is whether the Coxes presented substantial evidence to support this contention.
In Granberry v. Johnson, 491 So.2d 926 (Ala.1986), this Court discussed the showing necessary to void a transaction as fraudulent:
"The law on fraudulent conveyances is expressed in Code 1975, § 8-9-6:
"`All conveyances or assignments in writing, or otherwise, of any estate or interest in real or personal property... made with intent to hinder, delay or defraud creditors, purchasers or other persons of their lawful actions, damages, forfeitures, debts or demands... are void.'
Thus, under the statute, the concurrence of three elements is necessary before a conveyance can be declared fraudulent: (1) that the creditor was defrauded; (2) that the debtor intended to defraud; and (3) that the conveyance was of property out of which the creditor could have realized his or her claim or some portion of it. Roddam v. Martin, 285 Ala. 619, 235 So.2d 654 (1970). The debtor-creditor relationship is created not by a judgment, but by the wrong which produces the injury; and it is the date of the wrongful act, not the date of the filing of the suit or of the judgment, which fixes the status and rights of the parties. 285 Ala. at 622, 235 So.2d at 656. Hence, a tort claimant is a creditor, and the alleged tortfeasor is the debtor. See also Pope v. Payne, 289 Ala. 203, 266 So.2d 761 (1972).
"In Smith v. Wilder, 270 Ala. 637, 120 So.2d 871 (1960), this Court further articulated some of the principles governing fraudulent conveyances. An existing creditor seeking to set aside a conveyance may do so because of either actual fraud or constructive fraud. Actual fraud denotes the actual mental operation of intending to defeat or delay the rights of the creditor. On the other hand, constructive fraud is based on facts and circumstances which courts have said constitute legal fraud, regardless of actual intent. The term `constructive fraud' is generally used to refer to those instances where a grantor, indebted at the time, conveys property without receiving valuable consideration. 270 Ala. at 649, 120 So.2d at 882. See also J.C. Jacobs Banking Co. v. Campbell, 406 So.2d 834, 841-42 (Ala.1981).
"The Smith Court further stated that where one seeks to set aside a conveyance because of constructive fraud, the complainant bears the burden of showing that his or her debt antedated the conveyance. When such proof is made, the burden shifts to the grantee to show that (1) the grantor owed a debt to the grantee; (2) the consideration for the conveyance was the extinguishment of the existing debt; and (3) the value of the property conveyed was no more than a fair equivalent for the debt amount. Smith v. Wilder, 270 Ala. at 650, 120 So.2d at 883. Conveyances of property between family members in the face of a pending suit against the grantor must undergo especially careful scrutiny. Reese v. Smoker, 475 So.2d 506 (Ala. 1985)."
491 So.2d at 928-29 (emphasis added).
As Granberry teaches, the debtor-creditor relationship in this case was created *202 not on the date the Coxes filed their action, or on the date they received a default judgment, but on the date their cause of action against Hughes accrued. Based on the date the Coxes purchased their house, we conclude that their cause of action accrued in January 1986. (See Hughes, quoted above.) The first question, therefore, is whether the Coxes presented substantial evidence indicating that their debt predated the allegedly fraudulent conveyance.
The evidenceat first glanceappears to answer that question in the negative, inasmuch as the stock sale was manifested by a handwritten document dated November 7, 1984. That document stated in pertinent part:
"Meeting of the Board of Directors of Plier-Hughes, Inc.
"I the undersigned owner of fifty (50) Shares of Stock hereby transfer all my rights to pay all my debts owed to Plier-Hughes, Inc. Debts paid in full on this 11-7-84: Transfer One Share to Oscar B. Plier and forty nine shares to Ollie M. Plier."
(Emphasis in original.) Beneath the text appear the signatures of Gearlene Hughes and Oscar B. Plier and Ollie M. Plier.
The Coxes, however, presented the affidavit testimony and document analysis of Keith Nelson, a "certified forensic document examiner." He examined between 30 and 40 documents from the records of Plier-Hughes, Inc., including the handwritten, November 7, 1984, stock-sale document. His report states in pertinent part:
"On 3/19/99, I traveled to Montgomery, Alabama, to examine documents in this matter. At that meeting, I was provided with a set of tax documents, a large number of canceled checks and the corporate record book for Plier-Hughes, Inc.
"A preliminary examination of the tax documents and canceled checks did not reveal anything to cause immediate concern. However, when I examined the corporate record book, my attention was drawn to the handwritten documents used to record resolutions and meetings of the Board of Directors. I extracted thirty-eight documents from this section of the book for further examination. They are listed and described on Exhibit A of this report. Thirty-six of these documents were entirely handwritten.[1] "I conducted a variety of examinations of these documents, including video spectral examination of the inks for infrared reflectance and luminescence characteristics, ultraviolet examination of the paper for fluorescence characteristics and electrostatic imaging of the paper to detect writing images and impressions. I also examined a number of the signatures under magnification to study the color of the inks and the inking characteristics of the pens with which they were written. While the results of each individual examination are not particularly noteworthy, when correlated with each other certain circumstances are of particular note.
"1. Although dated over an eight year period, the `Oscar B. Plier' signatures appearing on documents Q4, Q5, Q6, Q7, Q8, Q11 and Q13 were all prepared with black ball pen ink which is similar in color and physical characteristics and similar with regards to infrared luminescence and reflectance characteristics. On each of these documents, *203 the `Ollie Mae Plier' or `Ollie M. Plier' signature was prepared with ink different from the `Oscar B. Plier' signature but similar to each other in color and physical characteristics and similar with regards to infrared luminescence and reflectance characteristics.
"2. Although dated over an eighteen year period, the `Oscar B. Plier' signatures appearing on documents Q9, Q15, Q16, Q20, Q27, Q28 and Q38 were all prepared with black ball pen ink which is similar in color and physical characteristics and similar with regards to infrared luminescence and reflectance characteristics. On each of these documents, the `Ollie Mae Plier' or `Ollie M. Plier' signature was prepared with ink different from the `Oscar B. Plier' signature but similar to each other in color and physical characteristics and similar with regards to infrared luminescence and reflectance characteristics.
"3. Although dated over a seven year period, the `Oscar B. Plier' signatures appearing on documents Q14, Q17, Q19, Q23 and Q25 were all prepared with black ball pen ink which is similar in color and physical characteristics and similar with regards to infrared luminescence and reflectance characteristics. On each of these documents, the `Ollie Mae Plier' signature was prepared with ink different from the `Oscar B. Plier' signature but similar to each other in color and physical characteristics and similar with regards to infrared luminescence and reflectance characteristics.
"4. Electrostatic imaging revealed numerous writing impressions, many of which were associated with writing on other pages in the record book. Impressions of writing on document Q3 were found on Q2, Q4 on Q5, Q5 on Q6, Q7 on Q8, Q9 on Q10, Q10 on Q11, Q11 on Q13, Q16 on Q15, Q15 on Q16, Q14, Q15, and Q16 on Q17, Q17 on Q18, Q19 on Q20, Q21 and Q17 on Q22, Q21 and Q22 on Q23, Q23 on Q24, Q25 on Q26, Q26 on Q27, Q29 on Q30, Q32 on Q31, Q31 on Q32, Q33 on Q34, Q33 on Q35, Q37 and Q38 on Q36 and Q36 and Q38 on Q37.
"Some of these impressions can be considered unremarkable. For example the impressions of Q16 on Q15, and vice-versa, might be expected since both documents are dated the same. Similar circumstances are true of the impressions of Q3 on Q2, Q29 on Q30, Q32 on Q31, Q31 on Q32, Q33 on Q34, Q37 on Q36 and Q36 on Q37.
"The remaining impressions, however, are notable in that they were created by writings on pages dated months apart. The pages were arranged in the book in date order and the impressions, where found, were generally consistent with this order. This is notable in that, if the writing was prepared in date order, then many of the documents were written while lying on top of the blank sheet of paper which would become the next page in the book, even though it would be dated months later. If the binder contained a supply of blank pages and the writing was prepared while the pages were in the binder, this might not be of particular note. However, at the time of my examinations there was no supply of blank pages in the binder. Also, some of the impressions were not aligned with the page such [as] they would have been written with the pages held in a binder. Some of the impressions consisted only of signatures on the previous page and others only of the non-signature text.

*204 "Several documents bore impressions of handwritten entries not attributable to any of the other documents in the file, yet appeared to be the results of the preparation of documents of a similar nature. This indicates additional documents were prepared but are not now contained in the corporate record book. Some or all of these additional documents may have been drafts of documents now in the file.
"5. The text of Q31 and Q32 is very similar. These documents appear to be separately written records of the same meeting. The text of Q33, Q34 and Q35 are also very similar and appear to be separately written records of the same meeting.
"Based upon the similarities in the inks of the `Oscar B. Plier' and `Ollie Mae Plier' signatures noted in paragraphs 1, 2 and 3, above, and the nature of the numerous impressions detected, it is my opinion that many, and perhaps all, of the handwritten documents contained in the corporate record book of Plier-Hughes, Inc. were prepared at one time or in groups and were not prepared contemporaneously with the individual meetings to which they purport to pertain."

(Emphasis and footnote added.)
Of particular significance, when considered in connection with Nelson's conclusions, is the "personal financial statement" of Gearlene Hughes, which is dated December 16, 1986, that is, approximately two months after the Coxes filed their complaint against her in the underlying action. Hughes submitted this statement to First Alabama Bank "for the purpose of procuring, establishing and maintaining credit." "Schedule 3Non-marketable Securities," shows 100% of the shares of Plier-Hughes, Inc., valued at $580,862, "registered in the name of Gearl[ene] Hughes." Of course, this was more than two years after she had purportedly transferred all her ownership in the company to her father and mother in exchange for the cancellation of a debt owed to the corporation.
The defendants do not refuteor even addressthis evidence in their brief. They state only that "Gearlene Hughes continued as a shareholder in a company until 1984," at which time, they say, "all of her shares were transferred to Oscar Plier and Ollie Mae Plier"; consequently, they allege, the Pliers became the "sole shareholders" of the corporation. Brief of Appellees, at vi. These "facts," they insist, are "undisputed." Id. Of course, those facts are disputed, for the time and the manner in which Hughes disposed of her stock in the corporation is the core of the dispute in this case.
This evidence is sufficient to support an inference that Hughes did, in fact, own allor a large blockof the stock in the corporation in December 1986; that she subsequently prepared the handwritten stock-sale document; and that she back-dated that document to a period predating the accrual of the Coxes' cause of action to avoid the consequences of an adverse judgment. The Coxes, therefore, presented substantial evidence indicating that their "debt antedated the conveyance." Granberry, at 491 So.2d at 929. The evidence was sufficient to shift the burden to the defendants to show that "(1) the grantor owed a debt to the grantee; (2) the consideration for the conveyance was the extinguishment of the existing debt; and (3) the value of the property conveyed was no more than a fair equivalent for the debt amount." Id. This, the defendants failed to do.
Regarding the "debt," the defendants state only that "[t]he consideration for the transfer of shares of stock in Plier-Hughes, *205 Inc., was the forgiveness of debt in the amount of $66,800." Brief of Appellees, at vi. Evidence of this debt, however, is not apparent in the record. For example, the record contains 15 checks drawn on the account of Plier-Hughes, Inc., totaling $6,500. They are made to, and signed by, Gearlene Hughes. The record also contains a number of checks similarly made out and signed, which are drawn on the account of Plier & Hughes Contractors. These checks are dated from 1972 to 1978, and total $43,200.[2] But even if the two amounts were added, they would total only $49,700not $66,800 as the defendants allege the debt totaled.
It must also be remembered that Hughes purportedly conveyed her stock to Oscar and Ollie Plier, individually, not to the corporation, from which she borrowed at least some of the money. It goes without saying that transactions with a corporation are not legally equivalent to transactions with individuals. Moreover, there is no allegationmuch less evidencesuggesting the fair market value of the shares Hughes conveyed to her parents.
Thus, significant factual issues remain as to the exact amount of Hughes's debt, to whom it was owed, and the value of the stock she purportedly conveyed. The defendants offer no explanation for these ambiguities and omissions in the evidence. This is especially significant in view of the fact that "[c]onveyances of property between family members in the face of a pending suit against the grantor must undergo especially careful scrutiny." Granberry, 491 So.2d at 929 (citing Reese v. Smoker, 475 So.2d 506 (Ala.1985)). On the state of this record, we cannot say the defendants met their burden of showing a bona fide transaction to extinguish an existing debt.
For these reasons, the summary judgment was inappropriate as to the fraudulent-transfer claim. Therefore, as it relates to that claim, the judgment is reversed. As it relates to the claim seeking to pierce the corporate veil, the judgment is affirmed. The cause is remanded for further proceedings consistent with this opinion.
APPLICATION FOR REHEARING GRANTED; OPINION OF JUNE 30, 2000, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOOPER, C.J., and MADDOX, HOUSTON, LYONS, JOHNSTONE, and ENGLAND, JJ., concur.
SEE, J., concurs in the result.
SEE, Justice (concurring in the result).
I agree that the judgment on the claim seeking to pierce the corporate veil should be affirmed and that the trial court erred in entering a summary judgment in favor of Hughes and the other defendants on the Coxes' fraudulent-transfer claim; I do not agree that the dispositive issue on the fraudulent-transfer claim is the question of when Hughes transferred her Plier-Hughes stock to her parents. Therefore, I concur in the result.
There is a question of fact as to when Hughes transferred her Plier-Hughes stock to her parents. The main opinion applies Ala.Code 1975, § 8-9-6, which was repealed effective January 1, 1990. If the transfer occurred after January 1, 1990, then the Alabama Uniform Fraudulent *206 Transfer Act, Ala.Code 1975, §§ 8-9A-1 through 12, applies. See Act No. 89-793, Ala. Acts 1989, § 14.[3] However, whether the transfer was made before or after the Coxes' cause of action accrued, and whether the transfer was made before or after the effective date of the Alabama Uniform Fraudulent Transfer Act, the summary judgment in favor of Hughes was improper as to the fraudulent-transfer claim because there is a question of fact as to whether Hughes transferred her stock in Plier-Hughes, Inc., to her parents with the actual intent to defraud the Coxes. If Hughes did transfer her stock with the intent to prevent the Coxes from satisfying their judgment against her, then, under either the Alabama Uniform Fraudulent Transfer Act or the prior fraudulent-transfer law, this case would be one of actual fraud, not constructive fraud, and the Coxes would be entitled to set aside the transfer regardless of whether it was made before or after their cause of action accrued. See Ala. Code 1975, § 8-9A-4(a); Granberry v. Johnson, 491 So.2d 926, 928-29 (Ala.1986). Thus, the issue whether Hughes transferred the stock before or after the Coxes' claim arose is not dispositive.[4]
I would reverse the summary judgment in favor of Hughes on the Coxes' fraudulent-transfer claim because there is a question of fact as to whether Hughes transferred her Plier-Hughes stock to her parents with the intent to prevent the Coxes from being able to satisfy their *207 judgment against her. Therefore, I concur in the result of the main opinion.
NOTES
[1] Nelson cataloged the documents as "Q1" through "Q38." The challenged stock-sale document is either "Q15" or "Q16."
[2] Because Plier-Hughes, Inc., was incorporated in 1974, the two companies apparently functioned simultaneously.
[3] The Alabama Uniform Fraudulent Transfer Act carries forward the preexisting distinction between actual fraud and constructive fraud; however, in certain cases of constructive fraud, the Act eliminates the requirement that the plaintiff-creditor show that his claim arose before the alleged fraudulent transfer. Compare Ala.Code 1975, § 8-9A-4, and the comments thereto, with Granberry v. Johnson, 491 So.2d 926, 928-29 (Ala.1986) (quoted in the main opinion). Ala.Code 1975, § 8-9A-4(a), deals with actual fraud, and it carries forward the preexisting rule that "[a] transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor." Whether the asset was transferred to a relative is a factor to consider in determining whether the transfer was made with "actual intent." See § 8-9A-4(b)(1); § 8-9A-1(8). Section 8-9A-4(c) deals with constructive fraud. Unlike the old rule stated in Granberry that, in cases of constructive fraud, the debtor must show "that his or her debt antedated the conveyance," the new law set forth in § 8-9A-4(c) provides that, in certain circumstances, a transfer is constructively fraudulent as to a creditor, "whether the creditor's claim arose before or after the transfer was made." (Emphasis added.) Section 8-9A-5 carries forward the traditional rules concerning constructive fraud and sets forth the circumstances in which a transfer is constructively "fraudulent as to a creditor whose claim arose before the transfer."
[4] The main opinion's conclusion that the Coxes' cause of action accrued in January 1986 is, therefore, unnecessary. It also appears to be incorrect. The Coxes alleged against Hughes, among other claims, fraud and misrepresentation. See Hughes v. Cox, 601 So.2d 465, 467 (Ala.1992). The Hughes opinion states that the Coxes did not discover until June 1986 that their house had no septic tank. See id. at 466. A fraud claim accrues at the time the plaintiff "discovers" the fact constituting the fraud. See Gray v. Liberty Nat'l Life Ins. Co., 623 So.2d 1156, 1159 (Ala. 1993). The time of discovery is the earlier of actual discovery or actual knowledge of facts that would put a reasonable person on notice of the fraud. See Liberty Nat'l Life Ins. Co. v. Parker, 703 So.2d 307, 308 (Ala.1997). The question of when the party discovered or should have discovered the fraud is generally one for the jury; however, it may be decided as a matter of law where the plaintiff actually knew of facts that would have put a reasonable person on notice of the fraud. See id. Thus, absent evidence of facts that would have put the Coxes on notice, one must conclude that their fraud claim did not accrue in January 1986 because they did not know until June 1986 that their home had no septic tank.