[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 83 
The plaintiffs Betty Newson and Willie Newson, a married couple, appeal the Rule 12(b)(6), Ala. R. Civ. P., dismissal of their claims for misrepresentation, suppression, conversion, and conspiracy against all four defendants, Protective Industrial Insurance Company of Alabama ("PIICO"), Felicia Scott Nichols, Shareef Id Deen, and Rosetta Randolph, and the Rule 12(b)(6) dismissal of the plaintiffs' claim for negligent or wanton employment practices against only PIICO. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
 I. Facts A. Substantive Facts
But for one exception, the only substantive facts material on a Rule 12(b)(6) motion to dismiss are the facts alleged in the complaint. The exception is that "`"if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably *Page 84 
authentic copy to the court to be considered on a motion to dismiss."'" Donoghue v. American Nat'l Ins. Co.,838 So.2d 1032, 1035 (Ala. 2002) (citations omitted) (quoting Wilson v.First Union Nat'l Bank of Georgia, 716 So.2d 722, 726
(Ala.Civ.App. 1998), quoting in turn GFF Corp. v. AssociatedWholesale Grocers, Inc., 130 F.3d 1381, 1384-85 (10th Cir. 1997)). Therefore, facts contained in such documents also may be considered. We will recite the substantive facts in accordance with these principles. The sources of these facts are the original complaint, the first amended complaint, and the copies of insurance policies and checks cited in the plaintiffs' pleadings and attached to the defendants' motion.
During the 25 years preceding this lawsuit, the Newsons took out a number of PIICO life insurance policies on their lives. In addition, Mrs. Newson took out two policies insuring the life of the Newsons' son, James D. Newson ("James"), and one policy insuring the life of the Newsons' grandson, Keyon Orr ("Keyon"). Mrs. Newson, using joint funds belonging to her and Mr. Newson, paid all of the premiums on the policies insuring the lives of James and Keyon. The policies insuring the lives of James and Keyon do not identify an owner of the policies by name or generic description.
The two policies insuring James's life provide that "upon written request to the Company [subject to conditions not pertinent to this case] the Company will pay a cash surrender value." To whom, these two policies do not say. The policy insuring Keyon's life provides that "the Insured [Keyon], while living, may [subject to conditions not pertinent to this case] obtain the cash surrender value of this Policy."
PIICO agents Felicia Scott Nichols ("Nichols") and Rosetta Randolph ("Randolph") usually came to the Newsons' home to collect the premiums on policies the Newsons had taken out. To induce the Newsons to pay these premiums, Nichols and Randolph falsely represented that the premium payments would be applied to these policies. However, Nichols, Randolph, and Shareef Id Deen ("Deen"), a PIICO manager, did not apply all of the Newsons' premium payments to the payment of premiums on these policies.
About May or June 1999, Nichols and Randolph falsely told the Newsons that they needed to surrender five policies, consisting of a $1,000 policy insuring Mr. Newson's life, a $1,000 policy insuring Mrs. Newson's life, the two policies insuring James's life, and the policy insuring Keyon's life, to use the cash surrender values to "catch up" the payments on some of their other policies. Nichols and Randolph told the Newsons also that they should use some of the cash-surrender-value proceeds they received from surrendering these policies to buy two new PIICO life insurance policies, one insuring the life of Mr. Newson for $2,000 and the other insuring the life of Mrs. Newson for $2,000.
During this conversation, Nichols and Randolph did not disclose to the Newsons: (1) that they could maintain all of their policies without surrendering any of them because the cash values that had accumulated in their policies would fund the payment of premiums under the automatic extended insurance provisions in the policies; (2) that the first $1,000 of coverage provided by each of the proposed $2,000 replacement policies on their respective lives would cost more than the corresponding $1,000 policy they would be surrendering; or (3) that their keeping the policy insuring the life of Keyon and paying the premiums would pay the policy up within six years.
The Newsons surrendered the five policies to Nichols and Randolph. In exchange, *Page 85 
PIICO issued four checks, each payable to the insured named in the surrendered policy or policies on that insured's life. At the direction of Nichols and Randolph, Mrs. Newson signed the respective names of the respective payees on the backs of the four checks, including the checks payable to James and Keyon. The back of each check bore the printed statement:
 "Endorsed and accepted as payment in full and releasing the Company of any and all liabilities under claim on policy number [appropriate policy number inserted]."
After Mrs. Newson endorsed the checks, Nichols and Randolph took the checks, and the defendants used the proceeds of the checks to "catch up" premiums on other existing policies that supposedly were unpaid, to pay the cost of issuing the new $2,000 policies on the lives of Mr. and Mrs. Newson, and to pay other premiums that the Newsons had not authorized.
On the basis of these facts, the Newsons claimed against PIICO, Nichols, Randolph, and Deen for misrepresentation, suppression, conversion, conspiracy, and "felonious injury." Against PIICO only, the Newsons claimed additionally for negligent or wanton hiring, training, and supervision of Nichols, Randolph, and Deen.
 B. Procedural Facts
The four defendants jointly moved the trial court to dismiss the Newsons' claims or, in the alternative, to enter summary judgments for the defendants. The defendants attached to the motion copies of the five policies the Newsons had surrendered, the four checks PIICO issued in exchange for the policies, and an affidavit by the custodian of these documents authenticating them. The defendants contended that the trial court should dismiss the Newsons' claims because: (1) the Newsons released the defendants from all claims when Mrs. Newson endorsed the checks, (2) the Newsons did not suffer any damage, (3) the Newsons did not have standing to sue for torts relating to the policies insuring the lives of James or Keyon, and (4) the counts for "felonious injury" did not state cognizable claims.
Opposing the motion, the Newsons argued that: (1) the trial court could, consistently with Rule 12(b), Ala. R. Civ. P., consider the policies and checks attached to the motion without treating it as a motion for summary judgment; (2) the releases on the backs of the checks did not release PIICO from tort liability and did not release Nichols, Randolph, or Deen from any liability; (3) the Newsons did suffer damage because they lost some premium payment monies as well as the cash value that had accumulated on the five policies they surrendered and they incurred a higher premium cost for the first $1,000 of coverage under each $2,000 replacement policy as a result of replacing their existing $1,000 policies on their own lives; and (4) the Newsons did have standing to sue for torts relating to the policies insuring the lives of James and Keyon because the Newsons had paid all of the premiums on these policies and had suffered the loss of the cash values of these policies.
Under Rule 56(f), Ala. R. Civ. P., the Newsons' attorney filed an affidavit stating that the Newsons would need discovery to respond if the trial court were to treat the motion as a summary-judgment motion. The defendants responded to the Newsons' attempts to take discovery by moving the trial court for a protective order. At a hearing on the discovery motion, the defendants agreed that the motion to dismiss or, in the alternative, motion for summary judgment should be treated as a motion to dismiss only.
The trial court, holding that "the releases were final releases," dismissed all of the *Page 86 
Newsons' claims. On appeal, all parties agree that the trial court did not treat the defendants' motion as a summary-judgment motion by considering the policies and checks attached to the motion and that the trial court dismissed the claims by granting a Rule 12(b)(6) motion to dismiss rather than by granting a summary-judgment motion.
The Newsons do not appeal the dismissal of their claims for "felonious injury." Similarly, on appeal the Newsons do not argue their claim against PIICO for negligent or wanton hiring, training, and supervision, and thus the Newsons abandon this claim. Tucker v. Cullman-Jefferson Counties Gas District,864 So.2d 317 (Ala. 2003).
On appeal, the Newsons assert the same arguments they asserted in the trial court. In response, PIICO, Nichols, Randolph, and Deen argue that this Court should affirm the dismissal not only for the reasons they asserted in the trial court but also for three additional reasons: (1) Mrs. Newson's endorsement of the checks constituted an accord and satisfaction that foreclosed the Newsons' claims; (2) a conversion claim will not lie for the recovery of the policies surrendered by the Newsons, the cash-surrender-value checks endorsed by Mrs. Newson, or the premiums paid by the Newsons, because the Newsons voluntarily relinquished the policies, checks, and payments and thereafter no longer owned the policies, checks, or payments; and (3) a conversion claim will not lie for the recovery of the money paid by PIICO for the cash surrender values of the surrendered policies or the money paid by the Newsons for premiums and allegedly misused by the defendants, because these forms of money are not sufficiently segregated and identifiable to support a conversion claim.
The Newsons respond to the defendants' new accord and satisfaction argument by arguing that accord and satisfaction forecloses only claims known to and intentionally relinquished by the creditor in exchange for payment of a lesser amount. The Newsons argue that their tort claims were neither known to them nor intentionally relinquished by them when Mrs. Newson endorsed the checks.
The Newsons respond to the defendants' first new argument against the conversion claims by arguing that the defendants obtained possession of the Newsons' policies, endorsed cash-surrender-value checks, and premium payments by fraud, which amounted to a wrongful taking of the Newsons' property by the defendants rather than a voluntary transfer of ownership by the Newsons pursuant to a valid offer and acceptance. The Newsons respond to the defendants' second new argument against the conversion claims by arguing that the premium payments, insurance policies, and cash-surrender-value checks were and are sufficiently segregated and identifiable to support conversion claims.
 II. Issues
The cardinal issue on appeal is whether the trial court erred in entering a Rule 12(b)(6) dismissal of the Newsons' claims for misrepresentation, suppression, conversion, and conspiracy. The subordinate issues are the grounds that the defendants argue to justify the Rule 12(b)(6) dismissal.
 III. Standard of Review
A trial court does not treat a Rule 12(b)(6) motion as a summary-judgment motion by considering authenticated documents that are attached to the motion to dismiss if "`"the document[s are] referred to in the complaint and [are] central to the plaintiff[s'] claim[s]."'" Donoghue, 838 So.2d at 1035. Accordingly, the standard of review applicable to Rule 12(b)(6) motions governs this appeal: *Page 87 
 "[A] dismissal for failure to state a claim is properly granted only when it appears beyond a doubt that the plaintiff can prove no set of facts entitling him to relief. Winn-Dixie Montgomery, Inc. v. Henderson, 371 So.2d 899 (Ala. 1979). Stated another way, if under a provable set of facts, upon any cognizable theory of law, a complaint states a claim upon which relief could be granted, the complaint should not be dismissed. Childs v. Mississippi Valley Title Insurance Co., 359 So.2d 1146 (Ala. 1978).
 "Where a 12(b)(6) motion has been granted and this Court is called upon to review the dismissal of the complaint, we must examine the allegations contained therein and construe them so as to resolve all doubts concerning the sufficiency of the complaint in favor of the plaintiff. First National Bank v. Gilbert Imported Hardwoods, Inc., 398 So.2d 258 (Ala. 1981). In so doing, this Court does not consider whether the plaintiff will ultimately prevail, only whether he has stated a claim under which he may possibly prevail. Karagan v. City of Mobile, 420 So.2d 57
(Ala. 1982)."
Fontenot v. Bramlett, 470 So.2d 669, 671 (Ala. 1985); accordBethel v. Thorn, 757 So.2d 1154, 1157 (Ala. 1999).
 IV. Release
An insured's release of an insurer from "liabilities under" a policy releases only contract actions on the policy. CarolinaCas. Ins. Co. v. Tisdale, 46 Ala.App. 50, 54, 237 So.2d 855,857-58 (Civ. 1970), cert. denied, 286 Ala. 741, 237 So.2d 861
(1970); Dominick v. Dixie Nat'l Life Ins. Co., 809 F.2d 1559, 1572 (11th Cir. 1987) (applying Alabama law). It does not release tort claims. Carolina Cas. Ins. Co., 46 Ala.App. at 54,237 So.2d at 857-58; Dominick, 809 F.2d at 1572. Accordingly, in the present case, the Newsons' "releasing the Company of any and all liabilities under claim on policy number [appropriate policy number inserted]" did not release PIICO from the tort claims. Moreover, it did not release Nichols, Randolph, or Deen from any claims. Wittner v. Kemp, 529 So.2d 961 (Ala. 1988). Therefore, we cannot affirm the dismissal of the Newsons' claims on the ground that the Newsons had released the defendants.
 V. Accord and Satisfaction "An accord and satisfaction is an agreement reached between competent parties regarding payment of a debt the amount of which is in dispute. There can be no accord and satisfaction `without the intentional relinquishment of a known right.'
 "Like any other contract, a valid accord and satisfaction requires consideration and a meeting of the minds regarding the subject matter.
 "Whether the parties have reached an accord and satisfaction is almost always a question for the jury."
Leisure American Resorts, Inc. v. Carbine Constr. Co.,577 So.2d 409, 411 (Ala. 1990) (citations omitted).
No agreement by the Newsons to accept the cash surrender checks as payment for their tort claims appears on the face of the complaint, the surrendered policies, or the checks. Therefore, we cannot affirm the dismissal of the Newsons' claims on the ground of accord and satisfaction.
 VI. Damage
This Court has recognized that a plaintiff can be damaged by the loss of cash value that has accumulated in a whole life insurance policy. See Crown Life Ins. Co. v. Smith,657 So.2d 821, 824 (Ala. 1995). This Court has held also that allegations *Page 88 
that fraud by a defendant insurer had caused the plaintiff unnecessarily to replace an existing policy with a new policy at a higher premium cost for the same coverage, sufficiently alleged damage to withstand a motion to dismiss. Boswell v. LibertyNat'l Life Ins. Co., 643 So.2d 580, 582 (Ala. 1994).
The Newsons sufficiently alleged that they had suffered damage by alleging that the defendants' torts caused the Newsons to suffer the loss of the cash surrender values of the policies they surrendered. See Crown Life, supra. The Newsons also sufficiently alleged that they had suffered damage by alleging that the defendants' torts caused them to replace their $1,000 policies with new $2,000 policies and thereby unnecessarily to incur a higher premium cost for the first $1,000 of coverage under each replacement policy. See Boswell, supra. The Newsons' allegations of misapplied premium payments also sufficiently allege damage. Willingham v. United Ins. Co. of America,628 So.2d 328, 332-33 (Ala. 1993). Consequently, we cannot affirm the dismissal of the Newsons' fraud claims on the ground that they failed to allege damage sufficiently.
 VII. Conversion "To establish conversion, one must present proof of a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property. Covington v. Exxon Co., U.S.A., 551 So.2d 935 (Ala. 1989); Gillis v. Benefit Trust Life Ins. Co., 601 So.2d 951 (Ala. 1992); Gray v. Liberty National Life Ins. Co., 623 So.2d 1156 (Ala. 1993)."
Crown Life, 657 So.2d at 823.
 "`Possession of a chattel obtained through fraud, artifice, stealth, or trickery without consent of the owner implied or expressed, is wrongful and will support an action for the conversion of the chattel.' Ford Motor Credit Co. v. Byrd, 351 So.2d 557, 560
(Ala. 1977)."
Brown v. Campbell, 536 So.2d 920, 921 (Ala. 1988).
 "It is well settled that money may be subject to a conversion claim, where there is an obligation to keep that money intact or to deliver it. 54 Am.Jur.2d Money § 5 (1971); 89 C.J.S. Trover and Conversion
§ 23 (1955). Generally, an action for conversion of money will not lie unless the money is specific and capable of identification. Greene County Bd. of Education v. Bailey, 586 So.2d 893 (Ala. 1991)."
Crown Life, 657 So.2d at 823.
This Court held in Crown Life that conversion did lie for the recovery of the plaintiffs' life insurance cash value wrongfully taken by the agent of Crown Life. In that case, the agent wrongfully took money from the plaintiffs in two ways. First, he forged the plaintiffs' endorsements on premium refund checks and deposited the checks into bank accounts belonging to the agent's corporation. Second, he forged the documents necessary to obtain unauthorized loans on the cash values that had accumulated on two Crown Life whole life insurance policies owned by the plaintiffs. At the plaintiffs' request, the trial court submitted to the jury only the plaintiffs' claims for conversion and wantonness. After the jury returned a verdict for the plaintiffs, Crown Life appealed. Among other arguments, Crown Life contended that the trial court had erred in submitting the conversion claim to the jury. Crown Life contended that neither the premium refund checks nor the cash values were sufficiently identifiable to support a conversion *Page 89 
claim. Rejecting this contention, this Court held:
 "Checks, and the property rights represented thereby, may be the subject of a conversion action. Alfa Mut. Ins. Co. v. Veal, 622 So.2d 1292 (Ala. 1993). A conversion action may also lie in regard to the cash surrender value of an insurance policy. Hamilton v. Hamilton, 255 Ala. 284, 51 So.2d 13 (1950).
 "We conclude that the trial court properly submitted the Smiths' conversion claim to the jury. Land forged the Smiths' signatures onto the Smiths' Crown premium checks, received the funds represented by those checks, and deposited those funds into his own corporation's accounts. These refund checks were specific, identifiable property that represented funds owed from Crown to the Smiths. Land wrongfully exercised dominion over the checks through his forgeries upon the checks and his retention of the funds; therefore, Land converted these checks. See Alfa Mut. Ins. Co. v. Veal, 622 So.2d 1292 (Ala. 1993).
 "Land also committed conversion when he took unauthorized loans on the cash values of the Smiths' Crown whole life insurance policies. Whole life insurance policies, unlike term life insurance policies, have both an insurance and a savings feature. See R. Keeton and A. Widiss, Insurance Law
§ 1.5(c)(1) (1988); Couch on Insurance 2d § 1:73 (Rev. ed. 1984). The owner of such policies builds up an interest-bearing, specific cash value in the policy, based upon the amount of premiums paid, against which he may borrow. The owner of the policy may also cancel the policy and receive the cash value of the policy. Because of this `cash surrender value' feature, whole life insurance policies involve a substantial element of investment, as well as insurance.
 "The cash values of the Smiths' whole life insurance policies were diminished by Land's unauthorized loans against them. As he did with the Smiths' premium refund checks, Land forged the Smiths' names onto the loan papers to take the funds. The whole life insurance policies owned by the Smiths had definite, precise cash values. By taking out the loans against these insurance policies, Land was exercising wrongful dominion over money that was specific and capable of identification. This money had `been entrusted to [Crown's] care' by the Smiths in return for life insurance coverage. Gray [v. Liberty Nat'l Life Ins. Co., 623 So.2d 1156] at 1160 [(Ala. 1993)]. While, according to Crown, the funds at issue were commingled with those of other Crown insureds, it is without question that the funds available under each policy were specifically identified by the policy number and could have been easily retrieved for the Smiths under the policy number. There is no doubt that Crown, if called upon to do so, could easily identify the specific value of each policy under the policy numbers. The funds taken by Land were `specific money capable of identification,' see Greene County Bd. of Education [v. Bailey, 586 So.2d 893 (Ala. 1991)], and, as such, could be the subject of a conversion claim."
657 So.2d at 823-24.
Moreover, in Gillis v. Benefit Trust Life Insurance Co.,601 So.2d 951, 952 (Ala. 1992), this Court held that conversion did lie for the recovery of money withdrawn by the defendant from the plaintiff's checking account under a preauthorized withdrawal plan to pay the premiums on a specific insurance policy. On the other hand, this Court held in Willingham v. United InsuranceCo. of America, *Page 90 
628 So.2d at 333, that conversion did not lie for the recovery of money paid as premiums for insurance in the absence of evidence that the money came from a specific account.
Relying on the decision of the Court of Civil Appeals inGardner v. State Farm Mutual Automobile Insurance Co.,842 So.2d 1 (Ala.Civ.App. 2002), the defendants in the present case argue that conversion cannot lie for the recovery of the surrendered policies, the endorsed cash-surrender-value checks, or the misused premium payments, because the Newsons voluntarily relinquished the policies, checks, and premium payments and thereafter did not own the policies, checks, or payments. However, Gardner is not apt.
In Gardner, the plaintiffs contended that State Farm agents had converted money the plaintiffs had paid to the State Farm agents as premium payments. Holding that the premium payments became the property of State Farm as soon as they were received by the State Farm agents, the Court of Civil Appeals held that the plaintiffs could not recover for conversion of the premiums by the agents because the premiums no longer belonged to the plaintiffs. The crucial difference between Gardner and the present case, however, is that the plaintiffs in Gardner did not contend that the insurance agents obtained the premium payments by fraud. The plaintiffs in Gardner contended only that the insurance agents wrongfully misused the plaintiffs' premium payments after the premium payments lawfully came into the insurance agents' possession. In contrast, the Newsons alleged that the defendants in the present case obtained the surrender of the plaintiffs' policies, the endorsement and relinquishment of their cash-surrender-value checks, and the payment of their premiums by fraud. Conversion will lie for a defendant's obtaining possession of a plaintiff's chattels by fraud. Brown, supra. Therefore, we cannot affirm the dismissal of the Newsons' conversion claims on the ground that the policies, cash-surrender-value checks, and premium payments no longer belonged to the Newsons once they relinquished possession of them.
Under Crown Life, the Newsons' cash surrender values were sufficiently identifiable both before and after the surrender of the policies to support a conversion claim. Therefore, we cannot affirm the dismissal of the conversion claim on the ground that the cash surrender values were insufficiently identifiable to support a conversion claim. Because the holdings of Gillis andWillingham demonstrate that the determination of whether conversion will lie for the recovery of money paid as insurance premiums depends on the evidence of the form, source, and mode of the payments, we cannot hold that the Newsons "can prove no set of facts entitling [them] to relief," Fontenot, 470 So.2d at 671, under their claim for conversion of the money paid by them as insurance premiums. Therefore, we cannot affirm the dismissal of the conversion claim on this ground either.
 VIII. Standing to Sue for Torts Relating to the Policies Insuring the Lives of Son James and Grandson Keyon A. Misrepresentation, Suppression and Conspiracy to Defraud
In National States Insurance Co. v. Jones, 393 So.2d 1361,1363-64 (Ala. 1980), this Court held that a niece who paid the premiums on a health policy insuring her aunt and who would owe the expenses the policy was to cover had standing to sue the insurer for its fraudulent "sales representations . . . made to and directed at" the niece, even though the niece was not named as the applicant, the *Page 91 
insured, the beneficiary, or the owner of the policy. AccordNorth Carolina Mut. Life Ins. v. Holley, 533 So.2d 497, 499
(Ala. 1987). Factors important to this standing were that "the insured . . . was related to the plaintiff . . ., the plaintiff occupied a special relationship with the insured . . . and was involved in some degree in the application process[,] the plaintiff . . . had assumed some responsibility for the care of the insured[,] . . . the benefits payable under the policy . . . would have been beneficial to the plaintiff in paying any obligation arising out of the plaintiff's assumption of responsibility for the care or burial of the insured[,] . . . and the plaintiff [had] paid either all of the premiums or some of the premiums." 533 So.2d at 499. Under the allegations of the complaint, the Newsons could prove such standing to sue the defendants for misrepresentation, suppression, and conspiracy to defraud committed in relation to the policies insuring the lives of James and Keyon. National States, supra; North CarolinaMutual, supra. Therefore, we cannot, on the ground that the Newsons lacked standing to sue, affirm the dismissal of their claims for misrepresentation, suppression, or conspiracy to defraud relating to the policies insuring the lives of James and Keyon.
 B. Conversion of Premiums
A party who pays the premiums on a life insurance policy has standing to sue for conversion of the premiums. See Gillis,supra. Because Mrs. Newson, using joint funds belonging to her and Mr. Newson, paid all of the premiums on the policies insuring the lives of James and Keyon, we cannot, on the ground that the Newsons lacked standing, affirm the dismissal of their claims for conversion of the premiums paid on the policies insuring the lives of James and Keyon.
 C. Conversion of Cash Surrender Values
A party entitled to the cash surrender value of a life insurance policy has standing to sue for the conversion of the cash surrender value. See Crown Life, supra. Because the policies insuring James's life do not identify the owner or the person entitled to the cash surrender values, the Newsons could prove that they were entitled to these cash surrender values. Therefore we cannot hold that the Newsons can prove no set of facts entitling them to relief for conversion of the cash surrender values of the policies insuring James's life. Thus, we cannot, on the ground of lack of standing, affirm the dismissal of the Newsons' claims for the conversion of the cash surrender value of the policies insuring James's life.
However, because the policy insuring Keyon's life provides that Keyon was entitled to the cash surrender value of that policy, the Newsons do not have standing to sue for the conversion of the cash surrender value of that policy. Therefore, we affirm the dismissal of the Newsons' claim for conversion of the cash surrender value of the policy insuring Keyon's life, because the Newsons did not have standing to assert that claim.
 IX. Conclusion
The trial court erred in dismissing the Newsons' claims against all defendants-appellees for misrepresentation, suppression, and conspiracy to defraud and erred in dismissing the Newsons' claims against all defendants-appellees for conversion of premiums on all policies and conversion of the cash surrender values of the policies insuring the respective lives of the Newsons and James. Therefore we reverse the dismissal of these claims and remand *Page 92 
the case for proceedings consistent with this opinion.
The trial court did not err in dismissing the claim against PIICO only for negligent or wanton hiring, training, and supervision and the claim against all defendants-appellees for conversion of the cash surrender value of the policy on Keyon's life. Therefore we affirm the dismissal of these claims.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, HARWOOD, WOODALL, and STUART, JJ., concur.