[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 107 
Plaintiffs/Appellees are wheat farmers. Defendants/Appellants are Lapeyrouse Grain Corporation and its subsidiary Montgomery Grain Corporation. The Corporations appeal from a $20,000 judgment (based on a general jury verdict) in favor of the farmers. The suit was upon a three-count complaint claiming compensatory damages for breach of contract, and compensatory and punitive damages for conversion and for fraud by misrepresentation of a material fact. The farmers alleged that the Corporations, on a date of their own choosing, bought for resale wheat delivered to them under an open price term agreement which provided that only the farmers could select the date of sale. We affirm.
The following question arises on appeal: Did the farmers present sufficient evidence of property rights to support standing (i.e., capacity) to sue for conversion of goods delivered under an open price term agreement, thereby making the trial court's denial of defendant Corporations' motion for a directed verdict as to the conversion claim proper? We address four parts of this issue: 1) What property rights are required? 2) Is the determination of such rights a question of law of or fact? 3) If a question of fact, did sufficient evidence exist upon which a jury could find the required rights? and 4) If so, should the court have charged the jury that it must not find conversion without first finding the plaintiffs possessed such property rights?
Additionally, the Corporations assert: 1) that the trial court erred in admitting into evidence irrelevant and highly speculative calculations of actual damages; 2) that the trial court erred in admitting evidence of inaccurate interest estimates; 3) that the issue of punitive damages was presented to the jury upon insufficient evidence; 4) that the Corporations' requested jury charges were improperly denied; and 5) that the trial court improperly admitted evidence of the Corporations' subsequent remedial measures.
 FACTS
In the summer of 1981, the farmers delivered more than 11,000 bushels of wheat to Montgomery Grain under an agreement designating the wheat as "unpriced." The farmers contend that an oral agreement and a course of dealing established that the term "unpriced" meant the farmers had the exclusive right to select the date of the wheat's sale. They further assert that they would not have delivered their wheat to the defendant Corporations without this provision, by which they hoped to profit from a rise in the fluctuating commodities market.
At the end of a business week in late August of the same summer, an officer of the parent corporation in Mobile called its Montgomery subsidiary to say that the following Monday was "the cut-off date" for wheat and that all unpriced wheat was to be sold at that day's price, which proved to be two cents per bushel lower than on the preceding day and eight cents lower than on the following day. Although the Corporations *Page 108 
maintain that the cut-off date was established prior to the wheat deliveries, they concede that no actions were taken to inform the farmers of such a date and that no employee who dealt directly with the farmers knew of the existence of such a date before the telephone order from Mobile.
When the farmers unexpectedly received checks, they called the Montgomery office to protest. Although the cut-off order was revoked as to one displeased nonplaintiff farmer, and although the Corporations were aware that the plaintiff farmers had not been notified of the cut-off order prior to its execution, the Corporations nevertheless did not restore the "unpriced" status to the wheat delivered by the farmers.
 STANDING TO SUE FOR CONVERSION
The Corporations contend that the farmers failed to produce evidence that, on the date of the alleged conversion, they had property rights sufficient to support standing to sue;[1] and, indeed, that they had no such rights because a writing on the back of a ticket, routinely handed to the farmer or his driver upon delivery to Montgomery Grain, stated that, upon delivery and acceptance, title passed to Lapeyrouse Grain Corporation.
The farmers contend that the writing was not an accurate reflection of the agreement between the parties; and that, to the contrary, in all former dealings between the farmers and the Corporations, the farmers had said they wanted to "store" their wheat until pricing and the Corporations consistently responded "fine" or "okay." The farmers also contend that the Corporations' action in assessing a storage or handling fee between the date of delivery and the date of pricing is inconsistent with the Corporations' assertion that the farmers had no title to the wheat on the cut-off date.
The farmers cite Ott v. Fox, 362 So.2d 836 (Ala. 1978), which summarizes Alabama law on standing to sue for conversion, and holds that "general or special title to the property or the immediate right to possession" is required for standing. Id., p. 839. The farmers argue that they had "at least a special title" to the wheat because of the storage arrangements evidenced by the fee.
In NYTCO Services, Inc. v. Wilson, 351 So.2d 875 (Ala. 1977), this Court found that standing to sue for conversion of commodities delivered under an open price term agreement may be based upon the determination that the parties intended delivery to effect a bailment rather than a sale. NYTCO at 879 approvingly quotes a Georgia Supreme Court decision as follows:
 "`If the owner of goods deliver them to another with the understanding that there is to be no sale until the happening of a certain condition, this is a bailment, and the title does not pass until and unless the condition happens.' Furst v. Commercial Bank, 117 Ga. 472, 475, 43 S.E. 728."
Although the writing in NYTCO suggests a bailment and the writing in the case before us suggests a sale, NYTCO
nevertheless found the writing to be only one factor in determining the intent of the parties. In neither NYTCO nor the instant case is the writing represented to be the final written expression of an agreement. The Alabama statute regarding open price term contracts for sale also makes it clear that the intent of the parties is paramount in determining whether a contract for sale has been concluded prior to the fixing of a price:
 "Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract." Code 1975, § 7-2-305 (4).
Thus, if the parties in this case intended not to be bound unless the farmers were allowed to choose the date of sale, then the delivery was a bailment rather than a sale; thus, the farmers had standing *Page 109 
to sue for conversion. The same authorities also indicate that the determination is properly for the jury. An Official Comment to the Uniform Commercial Code notes that whether the parties have intended a sale is "in most cases a question to be determined by the trier of fact." § 7-2-305, Official Comment 2.
The NYTCO Court said:
 "Therefore the court was not in error in denying defendants' motion for directed verdict since there was at least a scintilla of evidence that there was a bailment as to Covington Grain." NYTCO, at 879.
We find that the evidence of record concerning the storage agreement is sufficient to present a jury question as to whether the delivery was a bailment or a sale.
We now consider the question whether it was necessary for the court to instruct the jury that it must find the farmers had title to the grain before it could find conversion of that grain. The Corporations requested jury instructions (denied as untimely) to the effect that conversion might lie where "plaintiffs had general title to the property or immediate right to possession of said property." The court, however, did not expressly charge the jury "on standing," but simply defined conversion as "the appropriation of the personal property of one person by another for its own use or benefit [or the] exercise of dominion by another over the personal property of a person to the exclusion or in defiance of the owner's right."
Although the requested charge states a correct proposition of law, we find the trial court did not err in its refusal, in light of the court's oral instructions on the issue of ownership. If the jury decided that the "owners' rights" were denied, then it must have determined that the farmers were the owners; and that they had not intended to sell their wheat upon delivery, but rather to store it (bail it) until they decided to order its sale. If the agreement was to store, or if there was no agreement to the contrary, then there was no sale; and the farmers owned the wheat on the "cut-off" date.
We conclude that the court did not err in denying the defendant Corporations a directed verdict as to the conversion count. We need not, and do not, reach the issue whether standing would have resulted from a determination that Defendants' title was fraudulently obtained.
 EVIDENCE OF COMPENSATORY DAMAGES
The Corporations argue that the trial court should have excluded calculations based on various wheat prices because they represent "lost profits" that, under Paris v. Buckner FeedMill, Inc., 279 Ala. 148, 182 So.2d 880 (1966), are too speculative to be admissible. The evidence included the following wheat prices per bushel between the date of the cause of action and the trial date: 1) $3.32 — the highest price paid by Montgomery Grain; 2) $4.00 — the price paid by a Montgomery competitor; 3) $4.64 — the government "trigger price"; and 4) $4.94 — the highest price paid to the Corporations upon resale in Mobile.
We agree with the farmers' response that the term "lost profits," as used in Paris, is a mischaracterization of the evidence here. In Paris, the damages disallowed as "lost profits" were those based on the plaintiff's prospects for profits from subsequent transactions, not encompassed by the contract. In the case before us, however, the farmers seek compensation for the unauthorized sale of their wheat, which directly relates to the agreement between the farmers and the Corporations.
Although the standards for damages may vary among the different claims alleged in this case, and the jury must be properly instructed as to those standards, we hold the price evidence admitted was relevant in determining damages sustained under all of the Plaintiffs' theories of recovery. The trial court charged:
 "Your verdict must not be based on mere speculation or conjecture but must be based upon the evidence and just and reasonable inferences which you may draw from the evidence." *Page 110 
The Corporations do not contend that the price evidence was irrelevant to the conversion claim. Ott v. Fox, supra. Rather, they contend the price evidence is inadmissible on the fraud and breach of contract claims because it does not relate to prices the farmers could reasonably have expected to receive upon sale.
We reject this contention. Once the farmers had been precluded from selling their wheat on a date of their choosing, any evidence of price obtained for that wheat, regardless of the stage in the marketing process at which that price was obtained, is a factor the jury could use in determining the true damage accruing from the fraud or from breach of contract. Stated differently, each price furnished evidence from which the jury could draw reasonable inferences as to the actual amount of damages sustained. A careful examination of the record reveals no error either in the evidence admitted or in the jury instructions as to the damages issues.
 PUNITIVE DAMAGES
The Corporations assert that punitive damages should not have been considered by the jury because there was no evidence of the requisite intent. Punitive damages were requested as to fraud by misrepresentation of a material fact and as to conversion.
A proper jury issue on punitive damages was made if the farmers presented evidence of misrepresentation of a material fact made with the knowledge that it was false or made with reckless disregard as to its truth. Burroughs Corporation v.Hall Affiliates, Inc., 423 So.2d 1348 (Ala. 1982). We agree the trial judge properly found that a jury question existed as to such reckless disregard, because the evidence showed that the Corporations agreed to let the farmers select the date of pricing and, simultaneously, failed to mention the cut-off date to the farmers — or even to its own employees who dealt directly with the farmers.
To justify punitive damages for conversion, it was necessary for the farmers to produce evidence from which the jury could find that the Corporations converted the wheat in known violation of the farmers' rights and of the law. Ott v. Fox,supra; Ray Hughes Chevrolet, Inc. v. Gordon, 294 Ala. 638,320 So.2d 652 (1975). The farmers do not contend that the Corporations' behavior was otherwise insulting or malicious. A jury could reasonably conclude that the Corporation official in Mobile who ordered the wheat believed that title to the wheat had passed to the Corporation; however, there was also evidence from which a jury could conclude that the statements of the Corporation employees in Montgomery indicated the Corporations knew that the farmers owned the wheat, or may have owned it, on the cut-off date. We find sufficient evidence from which the jury could award punitive damages as to both fraud and conversion.
 DENIAL OF DEFENDANTS' REQUESTED JURY CHARGES
In the absence of a claim that Defendants had inadequate notice of the court's reasonable direction that requested jury charges be submitted prior to the close of the evidence, a direction authorized by Alabama Rules of Civil Procedure, Rule 51, we find no merit in the Corporations' assertion of error in the court's denial of the charges on the grounds they were untimely filed.
 EVIDENCE OF SUBSEQUENT REMEDIAL MEASURES
Next, we consider the Corporations' assertion that the court improperly admitted evidence of the Corporations' subsequent remedial measures taken to insure that farmers thereafter would know of any cut-off date. The defendant Corporations tried repeatedly to exclude the evidence by pretrial motion and by objections at trial; however, the trial court admitted the evidence even though it was not used under the usual exceptions for impeachment or for proving agency or control. *Page 111 
Alabama law clearly classifies as inadmissible, for the purpose of proving negligence, any evidence of remedial measures taken to prevent future physical injury — the elimination of safety hazards. City of Montgomery v. Quinn,246 Ala. 154, 19 So.2d 529 (1944). For an exception to this general rule, see, e.g., Norwood Clinic v. Spann, 240 Ala. 427,199 So. 840 (1941). It is less clear whether subsequent remedial measures to prevent injury resulting from future intentional acts, as here, are similarly protected.
Stated otherwise, the issue is whether the general rule applicable to negligence cases is equally applicable so as to disallow evidence of subsequent conduct as proof of the defendants' intentional misrepresentation or reckless disregard for the truth. We think the policy considerations are significantly different in the two situations. The due care standard for negligence, embracing notions of cause and effect, requires that the test be applied at the time and place of the wrongful conduct complained about. Norwood Clinic, supra. Additionally, the rule disallowing evidence of subsequent corrective measures as proof of defendants' prior negligence is based, at least in part, on the policy consideration "that admission of such evidence would discourage persons from improving the condition which caused the injury." BurbicContracting Co. v. Cement Asbestos Products Co., 409 So.2d 1
(Ala. 1982).
In the case of a claim for legal fraud, however, the policy considerations are materially different. The basis for the exclusion which obtains in the context of a negligence claim does not exist where, as here, the evidence of subsequent conduct is offered to prove the Corporations' knowledge of material facts allegedly misrepresented. While evidence of subsequent repairs is lacking in probative value to prove the requisite element of negligence, evidence in the instant case that the Corporations took precaution to inform subsequent customers of the sales cut-off dates is relevant to the Corporations' knowledge of that material fact at the time of their alleged misrepresentations to the plaintiff farmers. Moreover, as we have already observed, the evidence is without dispute that the Corporations did not mention the cut-off date even to their own employees who dealt exclusively with the farmers.
 PREJUDGMENT INTEREST
The Corporations' allegations of error with respect to certain rulings and jury instructions on prejudgment interest fall into two categories: 1) that the damages claimed and proved are not of the sort that permit prejudgment interest; and 2) even if prejudgment interest is allowable, the trial judge erred in instructing the jury that the legal rate of prejudgment interest was 12%, rather than 6% per annum. We disagree with the Corporations' first assertion, but agree that the legal rate of prejudgment interest is 6% per annum; and our order of affirmance is conditioned on an appropriate remittitur upon remand of this cause to the circuit court.
The statute, § 8-8-8, allowing prejudgment interest on damages for breach of contract, has been part of Alabama law since 1852. In clear and unmistakable language, that statute provides:
 "All contracts, express or implied, for the payment of money, or other thing, or for the performance of any act or duty bear interest from the day such money, or thing, estimating it at its money value, should have been paid, or such act, estimating the compensation therefor in money, performed."
At common law, certain damages were allowable for the detention of a debt, Vincent v. Gilmer, 51 Ala. 387 (1874); and prejudgment interest was allowable at the legal rate in claims other than those contractual in nature where the unliquidated damages could be ascertained by mere computation, or where the damages are complete at a given time so as to be capable of determination at such time in accordance with known standards of value. For two cases applying the common law rule, seeGlidden v. Street, 68 Ala. 600 (1881) (disallowing prejudgment interest for nonspecific *Page 112 
damages for trespass to land); and Atlanta Birmingham A.L.Ry. Co. v. Brown, 158 Ala. 607, 48 So. 73 (1908) (allowing prejudgment interest for negligent damage to crops).
The Corporations cite recent federal cases which analyze and summarize Alabama law respecting prejudgment interest. (SeeC.E. Sawyer's Industrial Sheet Metal Fabricators, Inc. v.Central Rigging and Contracting Corporation, 653 F.2d 956 (5th Cir. 1981), and cases cited therein.) It is apparent from theSawyer's summary of the Alabama rule that the cases relied upon by Sawyer's have attempted, in a somewhat awkward manner, to merge the statutory contract rule (§ 8-8-8) with the prejudgment interest rule applicable to noncontract claims as set out in Atlanta Birmingham A.L. Ry. Co., supra.
Whether we view the prejudgment interest issue as being controlled by two separate rules, or whether it is controlled by a single rule, for purposes of the instant case, we need not decide. If viewed under the contract rule, taking this statute at face value, then certainly prejudgment interest is allowable. Likewise, the unliquidated damages aspect of the tort rule does not prevent prejudgment interest here, because of the ease and certainty with which those damages can be ascertained. Once the jury reached a factual conclusion from the evidence as to the price differential, the compensatory loss could be fixed by a simple mathematical computation, as was the case in Atlanta Birmingham A.L. Ry. Co., supra.
We now turn to the Corporations' second assertion of error, regarding the appropriate legal rate of prejudgment interest. The Corporations assert that § 8-8-10, which now provides that all judgments, where no other rate is established by contract, "shall bear interest at 12% per annum," does not also set theprejudgment interest rate at 12% per annum. The Corporations contend that the legal rate of interest, set out in § 8-8-1, is 6%; and therefore, because no rate is specified in § 8-8-8, which provides for prejudgment interest for breach of contract, that the proper applicable interest rate is the legal rate — 6%. We agree with the Corporations' contention. See our discussion of this issue in Burgess Mining ConstructionCorporation v. Lees [Ms. 82-31, Sept. 23, 1983] ___ So.2d ___ (Ala. 1983).
Having found error in the trial court's allowance of 12% interest as opposed to the legal rate of 6%, we have no choice but to affirm conditionally — that is, to require the Plaintiffs/Appellees to file respective remittiturs commensurate with the difference between the amounts of the judgments as corrected to reflect interest at the rate of 6% per annum; or failing to meet this condition, the Appellees will suffer a reversal of the judgments and the cause will be remanded for a new trial.
Because the exact amount of compensatory damages is left uncertain in the jury's general verdict, in fairness to the Appellants, Appellees will be required to use $.36 per bushel — the highest difference in the value between the Defendants' purchase price and the market value — in the computation of the remittiturs. If the Appellees elect to file remittiturs in accordance with this Court's order of conditional affirmance, such filings shall be made within 28 days in circuit court, accompanied with appropriate explanations of the computations used in calculating the amounts shown therein, with copies to the clerk of this Court.
Upon examination and consideration (including a hearing if deemed appropriate) of any remittiturs and any replies (to be filed within 14 days thereafter) filed pursuant to this Court's order, the trial court shall enter an order of approval or disapproval as it deems appropriate, giving to the Defendants the benefit of all doubts with respect to the court's instruction to the jury on the issue of legal interest. The order of the trial court shall be forwarded forthwith to the clerk of this Court.
AFFIRMED CONDITIONALLY.
TORBERT, C.J., and MADDOX, SHORES and BEATTY, JJ., concur.
[1] Consistent with the vernacular of the parties, we have used the term "standing to sue," not in its traditional sense, but in the sense of testing the sufficiency of Plaintiffs' evidence as to the ownership or right of possession of the wheat — a requisite element of conversion. *Page 113