842 So.2d 1 (2002)
Paul E. GARDNER and Celia H. Gardner
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY et al.
2000279.
Court of Civil Appeals of Alabama.
January 18, 2002.
*2 Frank M. Wilson, Montgomery; and Lynn W. Jinks III and Christina D. Crow of Jinks, Daniel, Crow & Seaborn, L.L.C., Union Springs, for appellants.
Michael B. Beers and Winston W. Edwards of Beers, Anderson, Jackson, Hughes & Patty, P.C., Montgomery, for appellee State Farm Mutual Automobile Insurance Company.
Stephen E. Whitehead and Michael J. Clemmer of Lloyd Gray & Whitehead, P.C., Birmingham; and Michael E. Jones of Jones & Sport, Luverne, for appellee Al Snellgrove.
PER CURIAM.
On August 27, 1999, the plaintiffs, Paul E. Gardner and Celia H. Gardner, sued State Farm Mutual Automobile Insurance Company ("State Farm") and Al Snellgrove in the Crenshaw County Circuit Court, alleging breach of contract, conversion, unjust enrichment, and negligent and/or wanton supervision. The Gardners' claims arose after two State Farm employees absconded with some of their premium payments, along with payments of other State Farm customers.
Following discovery, State Farm and Snellgrove moved for a summary judgment. At the hearing on the summary-judgment motion, the Gardners voluntarily dismissed their unjust-enrichment claim. After the hearing, the trial court entered a partial summary judgment for the defendants on the claims alleging conversion, negligent supervision, and wanton supervision and for Snellgrove on the breach-of-contract claim, leaving the breach-of-contract claim pending against State Farm only. Pursuant to Rule 54(b), Ala. R. Civ. P., the trial court directed the entry of a final judgment on the partial summary judgment.[1] The Gardners appealed from the summary judgment as to their conversion, negligent-supervision, and wanton-supervision claims. The Gardners' appeal was transferred to this court, pursuant to § 12-2-7(6), Ala.Code 1975.
Because this appeal is from a summary judgment, our review is de novo. See EBSCO Indus., Inc. v. Royal Ins. Co. of America, 775 So.2d 128 (Ala.2000). In reviewing a summary judgment, an appellate court uses the same standard of review *3 that a trial court uses "in determining whether the evidence before the court made out a genuine issue of material fact." Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988). Once the movant makes a prima facie showing that no genuine issue of material fact exists and that he or she is entitled to a judgment as a matter of law, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794 (Ala.1989). "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). In reviewing a summary judgment, an appellate court must view the evidence in a light most favorable to the nonmoving party and entertain such reasonable inferences as the trier of fact would have been free to draw. Renfro v. Georgia Power Co., 604 So.2d 408 (Ala.1992).

Facts
Viewing the evidence in a light most favorable to the Gardners, as the applicable standard of review requires, the record indicates the following material facts. State Farm and its allied companies have a number of local offices across Alabama. Each local office is supervised by an "independent contract agent." The independent contract agent is paid commissions on policies sold from his or her local office, is responsible for staffing the office, and pays all office expenses from those commissions. Local office employees may become licensed insurance agents through the sponsorship of State Farm; after becoming licensed, staff employees are authorized to sell State Farm policies. Local office employees are also authorized to quote premiums, to receive premium payments, and to issue binders for coverage under the aegis of the independent contract agent's state insurance license.
Each State Farm local office has, among other accounts, a premium-fund account into which each insurance premium paid to employees at a State Farm local office is to be deposited. At the time a State Farm insured makes a premium payment, a staff employee accepts the payment, applies it to the insured's policy, and gives the insured a receipt. The payment is then typically entered into State Farm's computer system.
The record also indicates that each State Farm independent contract agent assigned to a local office has a register in which he or she is to record all deposits in order to reconcile the office accounts. Each day, the agent generates a summary of the day's deposits, and is responsible for reconciling monthly bank statements with the entries of premium payments in the State Farm computer system. Typically, a premium-fund-account reconciliation should be completed as soon as possible after the State Farm independent contract agent receives the office's monthly bank statements.
In addition to supervising local-office personnel, the independent contract agent in each State Farm local office is given authority, in regard to certain "smaller" insurance claims, to write claim checks up to $5,000 on a State Farm account to facilitate the prompt payment of smaller claims. State Farm refers to such authority as "agent-draft authority," and recommends that its independent contract agents use agent-draft authority as often as possible because doing so is convenient for policyholders and helps cement policyholders' relationships with the agent. Only the independent contract agent in a local office may sign checks pursuant to agent-draft *4 authoritystaff employees are not to sign such checks.
Each State Farm local office has a book of perforated blank checks for the purpose of making agent-draft-authority payments. These checks are issued in sequence, and State Farm has procedures to be followed for checks that are voided or spoiled. After an agent has prepared an agent-draft-authority check, it is given to the insured, and a copy is sent to the State Farm regional office. The bank account from which agent-draft-authority checks are drawn is owned by State Farm; thus, checks drawn on a local office's agent-draft-authority are not returned to the issuing local office, but are returned by the bank to a State Farm regional office, which thereafter prepares a monthly check report for the local office listing the pertinent payees, amounts, policy numbers, and insurance coverages. However, State Farm apparently has no procedure in place to ensure that the signature on the draft is actually that of the independent contract agent.
When, for some reason, there is temporarily not an independent contract agent in one of its local offices, State Farm designates that office as an "emergency services program" or "ESP." When a local office is designated as an ESP, the staff employees remain in place, continuing to quote premiums, to take applications, to accept premium payments, and to bind coverage; additionally, the staff employees become salaried employees of State Farm. When an office is designated as an ESP, the sole responsibility for financial management of that office is transferred to the State Farm agency field office to which that local office has been assigned. Because an ESP, by definition, has no independent contract agent in residence, personnel in an ESP do not have agent-draft authority to issue small claim checks. As one might surmise, ESP status is generally expected to last only for short periods.
Each State Farm local office (including ESPs) is assigned to an "agency field office." The field office is headed by an "agency field executive" and is assigned at least one "agency field consultant." When a local office is being managed by an independent contract agent, State Farm field employees visit the office at least once a month to reconcile the premium-fund account. Field employees also respond to questions or problems the independent contract agent may have, and they assist in training staff employees for the local office.
During the period pertinent to the Gardners' claims, State Farm's local office in Luverne, Alabama, was supervised by the Dothan agency field office. Tim Bryan was the field employee assigned to the Luverne local office; he was the only field employee in southeastern Alabama, supervising approximately 34 local State Farm offices in that region. Rich Potter was the agency field executive in charge of the Dothan-area State Farm agency field office beginning in November 1997.[2]
Periodically, State Farm agency field offices perform a "business management assistance review" of local offices. When a review is held, it must include an on-site review of an independent contract agent's premium-fund account records and that agent's procedure for agent-draft authority. During the review, the field employee is to review three randomly selected client files. The field employee is also to specifically review claims paid to household members *5 of agents or staff members. Although State Farm has published a manual for use in training its employees on how to conduct a business management assistance review, Bryan testified that he was not trained using that manual.
In 1994, Elizabeth McKinnon, who was the independent contract agent at State Farm's local office in Luverne, hired Sharon Davis as a staff employee. Davis later became a licensed agent for State Farm, serving in that capacity until May 1999. In October 1995, McKinnon left the Luverne local office, causing that office to be converted to an ESP. Consistent with the change, Davis became directly employed by State Farm, although she continued to function as a staff employee with the same duties and responsibilities she previously had. In October 1996, the ESP status of the State Farm local office in Luverne terminated when Tracy Townley came to the Luverne office as a trainee agent, acting as the office's independent contract agent on a trial basis.[3] In April 1997, Townley hired Cindy Sipper as a staff employee.
In July or August 1997, Townley left State Farm's employment, causing the Luverne local office to again became an ESP. At that time, State Farm asked Sipper to become a licensed agent. During State Farm's internal evaluation of Sipper, it was discovered that she had a poor credit history; nevertheless, Bryan recommended that she be licensed, and Sipper subsequently obtained an Alabama insurance license.
The Luverne local office continued on ESP status until defendant Snellgrove became a trainee agent in January 1998. At the time, Snellgrove had investigated fraudulent claims for State Farm for several years, but lacked experience as an agent and in office management. Snellgrove completed a year as a trainee agent and became an independent contract agent in 1999, serving the office's approximately 1300 insureds.
During Snellgrove's year as a trainee agent, the Gardners contend, State Farm became aware of problems in the Luverne office; they base that contention upon several insurance transactions involving Renae Ray. In February 1998, Ray paid money to purchase State Farm life-insurance coverage, and she purchased automobile insurance coverage from State Farm in April 1998. In August 1998, she financed the purchase of a Jeep automobile, which she also sought to insure through State Farm. In each instance, Ray dealt with Davis and Sipper.
When Ray contacted Davis to inform her that the lienholder on the Jeep had requested proof of insurance on the Jeep, Davis told Ray that she would "take care of that"; however, the lienholder continued to contact Ray with requests for insurance. Ray then contacted the State Farm regional office in Birmingham in October or November 1998 to obtain proof of insurance. At that time, State Farm personnel informed her that they had no record of her having purchased life insurance, that her automobile insurance had lapsed, and that she had never had any insurance on the Jeep. Ray was told to contact Potter in State Farm's agency field office in Dothan, who told her that he would get back to her. Potter then contacted Snellgrove, who discovered that one or more of Ray's insurance policies had lapsed; Snellgrove, in turn, asked Davis to explain the situation. Davis told Snellgrove that it was a *6 clerical error. Snellgrove asked Potter and Bryan to come to Luverne to review Ray's policies, at which time Potter and Bryan met with Snellgrove, Davis, and Sipper.
Potter stated in his deposition:
"This meeting was a culmination of an investigation I had done into [Ray's] problem, and this wasagain, there was a lot of information there and I laid it out for them and we were asking for an explanation as to what happened. And Sharon Davis, I believe, volunteered some information about the fact that she had failed to send an application in for an automobile insurance policy. And in an attempt to cover up that mistake, she made a mistake and sent another application in. So in the meeting she just said [`]I messed up, I did something I wasn't supposed to do.['] And she may have even mentioned termination at that time; [`]hey, if you want to fire me, I'll understand.[']"
Potter then reviewed Ray's checks and the records kept by Davis:
"So I had copies of these checks and I had a payment history here, and I just I could not match up the payments or the copies of the checks that she sent to me and where they were supposed to be applied. So far as a lapse in insurance coverage, there may have been lapses in insurance coverage. But I'll be honest with you, I couldn't make heads or tails of this."
After talking with Davis and reviewing the documentation on the policies, Potter recommended that Davis be fired. In contrast, Bryan believed that Davis had simply made a mistake. Snellgrove, who had the authority to fire Davis, did not do so.
The Gardners have had State Farm automobile insurance since the mid-1980s, and have insured several automobiles under policies obtained through the State Farm local office in Luverne. Before 1998, State Farm issued insurance policies for a Pontiac Grand Prix automobile and a Ford Ranger truck, as well as proof-of-insurance cards indicating that those vehicles were insured by State Farm under separate policy numbers. Typically, the Gardners were billed each month by State Farm for their automobile-insurance premiums, which they paid to Davis or Sipper.
Sometime in 1998, the Gardners traded the Grand Prix for a Pontiac Trans Sport automobile and traded the Ford Ranger for a Ford F-150 truck. On one occasion thereafter, Paul Gardner attempted to pay an insurance premium to Snellgrove personally; however, Snellgrove could not locate the pertinent insurance policy in the local office computer.[4] At that time, either Davis or Sipper said she would find the policy, after which one of them printed a premium receipt.
In May 1999, the president of a local bank, who was a friend of Snellgrove's, contacted Snellgrove to tell him that one of the local office's employees[5] had deposited into her personal bank account a claim check made out to an insured, Deborah Holley, who was Sipper's former sister-in-law. The claim check that was deposited was for damage to Holley's car; however, that car had not actually been damaged.
In response to the bank president's information, Snellgrove contacted field employee Bryan and met with Davis and Sipper. Davis and Sipper explained that Holley had been in financial trouble, that *7 they had given her money out of their own pockets, and that Sipper had endorsed the claim check as Holley's reimbursement. However, Davis and Sipper later accused each other of wrongdoing, and they were terminated by Snellgrove in May 1999. Both Davis and Sipper have since pleaded guilty to first-degree theft.
In May 1999, Celia Gardner called State Farm's local office in Luverne to ask about the deductible on her policy because Paul Gardner's truck had sustained a cracked windshield. However, she never submitted a written claim. The Gardners contend that they made no claim because the new employees that were hired by Snellgrove after Davis and Sipper's termination could not find a policy number for the Gardners' vehicles.
During the weeks following the termination of Davis and Sipper, it was discovered that premium payments that had been made through the Luverne local office on as many as 200 State Farm policies had not been deposited into the local office's premium-fund account; these unforwarded payments totaled approximately $78,000. State Farm also discovered that 700 automobile policies and 100 fire-insurance policies had lapsed between 1996 and the time Davis and Sipper were fired. Potter testified that in 1998 he had thought the number of cancellations was "a little bit" higher than normal, and that he had discussed the issue with Snellgrove.[6]
William Tevendale, State Farm's "vice president of agency" in Alabama, testified by deposition that Davis and Sipper had been paid claim checks out of the agent-draft-authority account; apparently, Davis and Sipper forged Snellgrove's signature on the checks. Tevendale stated that it would be "unusual" for a staff employee to be paid out of that account. Tevendale also testified that Snellgrove had signed documents with State Farm stating that premium payments were to be submitted "promptly" to State Farm and that agents are responsible for premiums until State Farm receives them. It appears that Snellgrove has paid $2,500 to State Farm for Davis and Sipper's theft; however, it is unclear whether State Farm will seek further reimbursement from Snellgrove.

Conversion
We first consider the correctness of the summary judgment on the Gardners' conversion claim against State Farm and Snellgrove. Under Alabama law, conversion consists of an act or omission by defendant with intent to assert control over property of the plaintiff. Martin v. Luckie & Forney, Inc., 549 So.2d 18 (Ala. 1989). In order to prove a prima facie case of conversion, a plaintiff must show that he has a general or special title to the property or the immediate right to possession of the property. Lapeyrouse Grain Corp. v. Tallant, 439 So.2d 105, 108 n. 1 (Ala.1983). Conversion requires "a wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has ... the immediate right of possession." Empiregas, Inc., of Gadsden v. Geary, 431 So.2d 1258, 1260 (Ala.1983).
At the time of the conversion, the plaintiff must have had general or specific title and actual possession or the entitlement to immediate possession of the property. Rice v. Birmingham Coal & Coke Co., 608 So.2d 713 (Ala.1992). To sustain an allegation of conversion the plaintiff must be able to show legal title and immediate right of possession. Thompson v. Ford *8 Motor Credit Co., 550 F.2d 256 (5th Cir. 1977).
The gravamen of the Gardners' conversion claim is that Davis and/or Sipper, purportedly within the scope of their employment with State Farm and/or Snellgrove, diverted specifically identifiable moneys (i.e., their premium payments) that the Gardners had paid to Davis and/or Sipper to keep their State Farm insurance policies in force. However, the Gardners' theory is, as a matter of insurance law, unsound because, at the time they made their premium payments to Davis and Sipper, the premium payments became the property of State Farm and not the property of the Gardners:
"An agent authorized to deliver the policy upon which the premium charges were based is vested thereby with apparent authority to collect the premiums, so that payment to him is payment to the company. Nor is it material that the agent entrusted with delivery of the policy failed to remit the premium to the insurer prior to the loss upon which the claim was predicated.
"The receipt of premiums by an agent appointed either expressly or by implication by the insurer to deliver the policy and collect premiums has been considered a receipt of such premium by the insurer. The fact that such agent, authorized to collect premiums, fails to remit them to the insurance company, does not deprive the insured of his protection. The majority rule seems to be that from the insured's point of view it is immaterial whether such agent fails to remit the premiums to the insurer until after the loss ...; if the insured was entitled to rely upon such agent's apparent authority to receive premiums, the payment is a valid one, irrespective of actual receipt by the company."
John A. Appleman, Insurance Law & Practice, § 7982 at 373-76 (rev.2d ed.1985) (emphasis added).
"Payment [of premiums] to a proper agent of the insurer is sufficient payment although the agent fails to give the insured a receipt therefor or to remit or turn over the money to the insurance company, or to credit the insured with the amount of the payment.

". . . .
"Th[is] rule ... is applied without regard to whether it is the initial premium or not and even though the policy is not to take effect until the first premium is paid. The fact that the insurer's agent failed to remit the first premium to the insurer, the agent having express authority to collect the first premium, does not prevent such fact from being a payment to the insurer. An insurance company is not absolved from liability on an insurance policy even if it never received the first premium from its agent and the policy was never returned, where the policy provided that the first premium might be paid to the agent and that the policy would not take effect unless such payment was made and the policy delivered within 30 days from its date."
George J. Couch, Couch on Insurance 2d § 31:125 at 161-62 (2d ed.1985). Thus, when Davis and Sipper failed to remit the Gardners' premium payments to State Farm, Davis and Sipper may have been guilty of conversion, but it was a conversion of property belonging to State Farmnot of property belonging to the Gardners.
Because the Gardners had no title to or possessory right intheir premium payments after they made the payments to Davis and Sipper as apparent agents of State Farm, the Gardners have no claim against State Farm for conversion. Compare Huntsville Golf Dev., Inc. v. Ratcliff, *9 Inc., 646 So.2d 1334 (Ala.1994) (architect relinquished property right in architectural plans when he assigned plans to bank for loan); Drennen Land & Timber Co. v. Privett, 643 So.2d 1347 (Ala.1994) (landowner who signed a timber-sales agreement never claimed that the timber company did not have the right to possession of the timber, so landowner had no claim for conversion); Ligon Furniture Co. v. O.M. Hughes Ins., Inc., 551 So.2d 283 (Ala.1989) (furniture company relinquished any right of immediate possession to fire-damaged property when it transferred possession of furniture to salvage company); Lapeyrouse Grain Corp. v. Tallant, supra (if farmers intended delivery of wheat to granary to be a sale rather than a bailment, then they did not have the ownership or right of possession of the property necessary for a conversion claim); American Standard Life Ins. Co. v. Johnson, 231 Ala. 94, 163 So. 632 (1935) (insurance agent who indorsed notes to company could not maintain action against company for conversion of the notes); Kansas City, M. & B.R.R. v. Wagand, 134 Ala. 388, 32 So. 744 (1902) (when owner abandoned a mule he could not thereafter maintain an action for conversion of the mule); Jones v. State Farm Mut. Auto. Ins. Co., 679 So.2d 1114 (Ala.Civ.App.1996) (auto insurer that paid insured for theft of car did not commit conversion by taking possession from buyer following insured's purported sale to buyer; insured had assigned legal title to insurer and buyer therefore lacked legal title and right to possession); Automotive Acceptance Corp. v. Powell, 45 Ala. App. 596, 234 So.2d 593 (Ala.Civ.App.1970) (plaintiff who had had his automobile repossessed upon default of chattel mortgage could not maintain an action for conversion of the auto). Thus, the trial court correctly entered the summary judgment in favor of State Farm and Snellgrove on the Gardners' conversion claim. See Smith v. Equifax Servs., Inc., 537 So.2d 463 (Ala. 1988) (appellate court may affirm judgment of trial court on any ground, including grounds not raised below).[7]

Negligent Supervision and Wanton Supervision
We next consider the correctness of the summary judgment as to the Gardners' claims of negligent supervision and wanton supervision. Our Supreme Court has noted that a claim of negligent supervision is stated as follows:
"In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence. This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, *10 character, and frequency that the master, in the exercise of due care, must have had them brought to his notice. While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care."
Armstrong Bus. Servs. v. AmSouth Bank, 817 So.2d 665, 682 (Ala.2001) (citations and internal quotation marks omitted).
In this case, the Gardners have presented substantial evidence indicating that State Farm and Snellgrove knew or should have known as of October or November 1998, that Davis and Sipper were not fit employees, when it was revealed that payments made by Renae Ray on life and automobile insurance policies, payments that were handled by Davis or Sipper, had not been forwarded to State Farm and that proof of automobile insurance coverage for her Jeep was not provided to the Jeep's lienholder. State Farm's own agency field executive testified that he could not "make heads or tails" of the situation at the time he investigated Ray's complaints, and Snellgrove rejected Potter's recommendation to fire Davis and Sipper at the time. Moreover, despite State Farm's policy that checks issued under agent-draft authority not be issued by anyone other than the independent contract agent in a local office, State Farm and Snellgrove failed to follow these procedures in a manner that would have prevented Davis and Sipper's theft of funds by the issuance of checks payable to them that were drawn pursuant to the Luverne local office's agent-draft authority. From that evidence, the trier of fact could conclude that State Farm and Snellgrove knew, or should have known, of the incompetency of Davis and Sipper to remain as employees in the Luverne local office after at least late 1998.
State Farm and Snellgrove contend that the Gardners can show no damage arising from any failure to properly supervise Davis and Sipper because, they say, the Gardners were entitled, as a matter of insurance law, to continued insurance coverage despite the failure of Davis and Sipper to properly transmit the Gardners' premium payments. However, that position overlooks evidence in the record that Paul Gardner procured and paid for other insurance from GEICO after State Farm personnel informed him that he had no coverage; further, it ignores that the Gardners, after being told that they had no coverage with State Farm, elected not to present a claim for payment for a cracked truck windshield that may have been payable under their State Farm automobile-insurance coverage. The trier of fact could reasonably conclude that the conduct of State Farm and Snellgrove in failing to properly supervise Davis and Sipper led to the Gardners' being informed that they did not have insurance coverage with State Farm and, thereafter, to their being injured by forgoing a valid claim and/or by paying an "unnecessary" premium to GEICO to procure insurance coverage to substitute for coverage they were entitled to have from State Farm. See Ramsey v. Avco Fin Servs., 646 So.2d 142, 143-44 (Ala.Civ.App.1994) (noting that in tort, a party "may recover all his damages if they flow directly and naturally from the breach [of duty] and are not speculative").
However, we reach a different conclusion as to the Gardners' wanton-supervision claim. In addition to requiring proof that an employer knows or should know that an employee is incompetent, a *11 claim of wanton supervision carries the additional requirement that the plaintiff demonstrate that the employer has "wantonly disregard[ed] its agent's incompetence," i.e., that it acted or omitted to act "with reckless indifference to the consequences of said act ... or omission," being "aware from [its] knowledge of existing circumstances and conditions that [its] conduct would probably result in injury to another or in damage to [another's] property." Armstrong Bus. Servs., 817 So.2d at 679-80 (emphasis added).
While the discovery that Davis and Sipper had not properly handled payments made by Ray arguably provided State Farm and Snellgrove with constructive notice that Davis and Sipper were not, in fact, competent employees, the record does not indicate that State Farm or Snellgrove, in retaining Davis and Sipper after the Ray incident, acted with knowledge that their retention would probably cause harm to other State Farm insureds. Indeed, State Farm field representatives who reviewed Ray's complaints could not agree as to whether Davis and Sipper's conduct in that case was a simple "clerical error." Also, while the Gardners point to the sheer number of cancellations of State Farm insurance policies between 1996 and 1999 (i.e., 800 policies), the record indicates that cancellations during that period were only slightly elevated above the level that State Farm personnel considered normal for a local office. Moreover, while Snellgrove, in his capacity as a State Farm independent contract agent, failed to review monthly reports of agent-draft-authority checks issued from the Luverne office that might have revealed that Davis and Sipper were issuing such checks to themselves, Potter testified that there was no requirement that Snellgrove do so. Finally, there is no indication in the record that State Farm had experienced a defalcation of a nature comparable to Davis and Sipper's from which it could be said to have obtained knowledge that such a theft was probable. Thus, the trial court correctly entered the summary judgment as to the Gardners' wanton-supervision claim.

Conclusion
Based upon the foregoing facts and authorities, we affirm the summary judgment in all respects except as to the Gardners' negligent-supervision claim against State Farm and Snellgrove. As to that claim, we reverse the summary judgment, and we remand the cause for further proceedings.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
PITTMAN and MURDOCK, JJ., concur.
YATES, P.J., and CRAWLEY and THOMPSON, JJ., concur in part and dissent in part.
YATES, Presiding Judge, concurring in part and dissenting in part.
I agree with the per curiam opinion that the Gardners failed to present substantial evidence of conversion. I also agree that the Gardners' negligent-supervision claim should be presented to a jury. However, I do not agree that the Gardners failed to present substantial evidence of wanton supervision. Therefore, I dissent as to this issue.
The supreme court in Ledbetter v. United American Insurance Co., 624 So.2d 1371, 1373 (Ala.1993), held that in order for an employer to be liable for negligent supervision, the plaintiff
"`must show or demonstrate that [the employer] had notice or knowledge (actual or presumed) of [the employee]'s alleged incompetency for [the employer] to be held responsible; demonstrating liability on [the employer]'s part requires affirmative proof that [the employee]'s *12 alleged incompetence was actually known to [the employer] or was discoverable by [the employer] if it had exercised care and proper diligence."
(Citation omitted.)
Section 6-11-20(b)(3) defines "wantonness" as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." The supreme court has distinguished negligence and wantonness:
"What constitutes wanton misconduct depends on the facts presented in each particular case. South Central Bell Telephone Co. v. Branum, 568 So.2d 795 (Ala.1990); Central Alabama Electric Coop. v. Tapley, 546 So.2d 371 (Ala. 1989); Brown v. Turner, 497 So.2d 1119 (Ala.1986); Trahan v. Cook, 288 Ala. 704, 265 So.2d 125 (1972). A majority of this Court in Lynn Strickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So.2d 142 (Ala.1987), emphasized that wantonness, which requires some degree of consciousness on the part of the defendant that injury is likely to result from his act or omission, is not to be confused with negligence (i.e., mere inadvertence):
"`Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury....'
"510 So.2d at 145. See also Central Alabama Electric Coop. v. Tapley, supra, and South Central Bell Telephone Co. v. Branum, supra."
Valley Bldg. & Supply, Inc. v. Lombus, 590 So.2d 142, 144 (Ala.1991).
In Big B, Inc. v. Cottingham, 634 So.2d 999 (Ala.1993), the plaintiff sued the corporate operator of a drug store and one of the store's employees, alleging false imprisonment, assault and battery, and negligent or wanton supervision; she alleged that the employee forced her to engage in a sex act with him. The supreme court affirmed a judgment based on a jury verdict on wanton supervision. The employee, a security guard, had been the subject of a sexual-harassment complaint by a young female employee. The court held that there was evidence before the jury that indicated that the defendant had not thoroughly investigated that sexual-harassment claim or filed a report with the company headquarters, and it held that the fact that the job the employee held put him in a position to demean or mistreat a female customer or employee was sufficient to allow the wanton-supervision claim to go to the jury, given the evidence indicating a failure to properly investigate the prior claim. In Alfa Mutual Insurance Co. v. Roush, 723 So.2d 1250 (Ala.1998), an Alfa insurance agent met with the plaintiffs, who had just started a new business and were seeking several kinds of insurance coverage. Although Alfa did not sell workers' compensation insurance, it allowed, and even encouraged, its agents to sell workers' compensation "pool coverage" from other designated insurance companies, so that it could provide for all of a customer's needs. Alfa did not publicly distinguish itself from the insurers providing pool coverage and did not otherwise inform customers that it would not be responsible for pool coverage written by its agents. Alfa had a strict system for controlling, monitoring, and auditing how agents handled Alfa's money. However, it had no safeguards for handling money from the sale of pool coverage. The agent sold the plaintiffs general-liability, products-liability, *13 and automobile insurance from Alfa. He also accepted a premium payment for workers' compensation insurance. However, he did not procure workers' compensation coverage; instead, he cashed the check, converted the funds for his personal use, and then misrepresented to the plaintiffs that they had workers' compensation insurance. The supreme court held that Alfa could be vicariously liable for the agent's acts. Alfa benefitted from encouraging its agent to write pool coverage. Alfa benefitted from the other policies sold in addition to the pool coverage. Alfa failed to establish any form of agent accountability for pool coverage, although it had many safeguards for its own policies. However, the plaintiffs failed to establish wanton supervision. The court noted that Alfa had received no prior complaints. Alfa did not know or have reason to know that agent was dishonest. Alfa agents normally dealt directly with the pool insurers in obtaining pool coverage.
In the instant case, the Gardners presented substantial evidence, for summary-judgment purposes, indicating that State Farm and Snellgrove knew or should have known about Davis and Sipper's behavior because of the Rays' complaint, the agency-draft-authority checks, and the number of lapses. The Rays became concerned after Renae had made several premium payments but had not received an insurance policy. The Rays also received notice from their finance company informing them that the cars had no insurance coverage. The Rays were told by the Birmingham office that it had no evidence indicating that any insurance policies had been issued to them. Rich Potter, an agency field executive, testified that he would have fired Davis after he investigated the Rays' complaint.
Additionally, the Gardners presented evidence indicating that State Farm and Snellgrove knew of Davis and Sipper's activities, or should have known of them if they had followed State Farm's procedures. Only Snellgrove had authority to sign agency-draft-authority checks. There was evidence indicating that Davis and Sipper forged Snellgrove's name on the checks. Some of those checks were issued to Davis and Sipper. William Tevendale's testimony indicates that this alone should have been questioned by State Farm and Snellgrove. State Farm would have known about the checks to Davis and Sipper, because the agency-draft-authority checks are returned to State Farm, and Snellgrove would have been given a list each month of every check written out of the agency-draft-authority account, along with the name of the payee.
State Farm is notified by Snellgrove every time a policy lapses. There were 1,300 policyholders in Luverne. In the three years before Davis and Sipper's termination, 700 automobile policies had lapsed and 100 fire policies had lapsed. Potter stated that he was concerned about the number of cancellations from the Luverne office and that he discussed this with Snellgrove.
The Gardners also submitted substantial evidence from which a jury could find that State Farm and Snellgrove's conduct was reckless or was committed in conscious disregard to the rights of its insureds. Before the Rays made their complaint, numerous policies in the Luverne office had lapsed. Potter was concerned about the number of lapses. Potter, after reviewing the Rays' complaint, recommended that Davis be fired. However, he did not notify his superiors of his recommendations. Davis remained employed, with no additional supervision, even after this incident and even though Potter knew that she was still allowed to quote and accept premiums from customers. State Farm *14 knew that Davis and Sipper were employed in the Luverne office when their names appeared as payees on agency-draft-authority checks, but no investigation was made. Snellgrove received a list of the checks drawn on that account, along with the names of the payees, but failed to make any inquiry.
Snellgrove and State Farm argue that the summary judgment was proper because, they say, the Gardners cannot demonstrate that they have suffered any damage on any of their claims.
In Boswell v. Liberty National Life Insurance Co., 643 So.2d 580 (Ala.1994), the plaintiffs sued their insurance company for fraud, alleging that it had switched their cancer insurance policies for cancer policies that cost more and provided less coverage. The trial court dismissed the plaintiffs' complaint, holding that the plaintiffs had incurred no injury, because no claim had been filed under either plaintiff's policy. The supreme court reversed the judgment of dismissal, stating:
"It is easy to understand the predicament the trial court faced in this case: the standard by which to judge whether a plaintiff has suffered damage or injury from an insurer's actions, when no claim has been filed, is nebulous at best, because there are two distinct lines of cases in this state. In the first line, the one on which the trial judge relied, claims were disallowed; although there was a period during which the plaintiffs did not receive the coverage for which they had paid, and even though the plaintiffs claimed that this was the result of the defendants' allegedly fraudulent acts, that period had passed without the plaintiffs' having filed a claim. See Moore v. Liberty National Life Ins. Co., 581 So.2d 833 (Ala.1991); Allen v. Gulf Life Insurance Co., 617 So.2d 664 (Ala. 1993); and Applin v. Consumers Life Insurance Co., 623 So.2d 1094 (Ala. 1993). The second line of cases has declared the fraud complete, and actionable, at the time the allegedly fraudulent transaction occurred, viewing the injury or damage as the payment of unnecessary premiums. See, e.g., Willingham v. United Ins. Co. of America, 628 So.2d 328 (Ala.1993); Liberty National Life Insurance Co. v. Waite, 551 So.2d 1003 (Ala.1989); Guinn v. American Integrity Ins. Co., 568 So.2d 760 (Ala.1990); Brewton v. Alabama Farm Bureau Mut. Cas. Ins. Co., 474 So.2d 1120 (Ala. 1985); Old Southern Life Ins. Co. v. Woodall, 348 So.2d 1377 (Ala.1977). We now believe that the better law is in this second line of cases. Therefore, to the extent that the holdings in Moore v. Liberty National Life Ins. Co., 581 So.2d 833 (Ala.1991), Allen v. Gulf Life Insurance Co., 617 So.2d 664 (Ala.1993), and Applin v. Consumers Life Insurance Co., 623 So.2d 1094 (Ala.1993), are inconsistent with cases declaring that the injury or damage from the fraudulent transaction is the payment of unnecessary premiums, these cases are overruled.
". . . .
"Make no mistake, even if the insured files no claim, the loss of what the insured paid for constitutes legal damage or injury. The insurer cannot be allowed to profit from its fraud simply because the insured is `lucky' enough never to have to `use' the coverage."
Id. at 582.
I find this case analogous to Boswell. Like the plaintiffs in Boswell, the Gardners paid unnecessary premiums. The plaintiffs in Boswell received less coverage than they had had under the original policy, while the Gardners received no coverage at all when they paid their premiums. The fact that the Gardners did not file a *15 written claim does not mean that they were not damaged by paying for insurance coverage and not receiving the coverage.
State Farm contends that, by law, it was estopped from denying coverage for the Gardners, based on § 27-23-21. Section 27-23-21 provides, in part, as follows:
"(a) No notice of cancellation of a policy of automobile liability insurance shall be effective unless it is based on one or more of the following reasons:
"(1) Nonpayment of premium;
". . . .
"(b) This section shall not apply to any policy of automobile liability insurance which has been in effect less than 60 days at the time notice of cancellation is mailed or delivered by the insurer unless it is a renewal policy."
This statute prevents an insurer from unilaterally cancelling a liability insurance policy without one of the reasons set out by the Legislature. It is designed as a shield to protect the consumer/insured from wrongful cancellation. It was not designed as a sword to protect the insurer from accountability. Furthermore, the supreme court, in Green v. Standard Fire Insurance Co. of Alabama, 398 So.2d 671 (Ala.1981), noted that § 27-23-21 applies only to automobile-liability insurance and not to other kinds of coverage, such as collision and comprehensive, which were involved in the instant case.
There was evidence presented that indicated that after Davis and Sipper's activities, State Farm determined that it would honor all coverage and pay any claims that subsequently arose. Insurance is "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an unknown or contingent event and is applicable only to some contingency or act to occur in the future." Black's Law Dictionary 802 (6th ed.1990). When State Farm determined that it would honor the policies, there was no future act or contingency for which it could insure the Gardners, since that time had passed. That means State Farm had no risk when it decided it would essentially "reinstate" coverage for the time when the Gardners paid premiums but no policies were in effect.
State Farm argues that this case is similar to Williamson v. Indianapolis Life Insurance Co., 741 So.2d 1057 (Ala.1999). I disagree. In Williamson, the plaintiff sued his insurance company, claiming that he was told his insurance premiums would "vanish" after 10 years. The plaintiff was subsequently told that he would have to continue paying premiums after the 10 years had passed. The supreme court held that the plaintiff had sustained no damage, yet, because the 10 years had not passed, and, therefore, his allegation that he might, in the future, have to continue paying a premium was speculation. In the instant case, the Gardners' injury is in the present, not the future. When they paid insurance premiums and received no coverage, their injury occurred.
CRAWLEY, Judge, concurring in part and dissenting in part.
I concur in the court's per curiam opinion affirming the summary judgment for State Farm on the Gardners' conversion claim. I also concur in the reversal of the summary judgment for State Farm on the Gardners' negligent-supervision claim. However, because I believe the Gardners presented substantial evidence of wanton supervision, I would reverse the summary judgment for State Farm on that claim also. I therefore dissent from the per curiam opinion insofar as it affirms the summary judgment on the wanton-supervision claim.
*16 THOMPSON, Judge, concurring in part and dissenting in part.
I agree that those portions of the trial court's order granting the summary judgment in favor of State Farm on the Gardners' claims alleging conversion and wanton supervision are due to be affirmed. I would also affirm the summary judgment on the negligent-supervision claim. Therefore, I dissent from the main opinion's reversal of the trial court's summary judgment as to that issue.
I conclude that the Gardners have failed to demonstrate that they suffered any damage as a result of State Farm's alleged negligent supervision of its employees. Paul Gardner testified that he had heard that two local State Farm employees had been accused of some type of misconduct, but that he was not aware of the details. In June 1999, shortly after hearing that rumor, Paul Gardner went to the local State Farm office to make a premium payment on his insurance policy. Paul Gardner testified that a new employee at the local State Farm office informed him that he was not shown in the computer system as having an insurance policy with State Farm. Paul Gardner testified that the new employee asked him if he was "aware of what was going on," and that he responded "no." Paul Gardner testified that the new employee told him that because he was not shown in the computer system, he should locate the check stubs and receipts for his premium payments to State Farm and return to the local State Farm office with those stubs and receipts. Paul Gardner did not testify that any State Farm employee told him that he had no insurance coverage.
Celia Gardner testified that in late May 1999, a few days before Paul Gardner tried to make the Gardners' June 1999 premium payment at the local State Farm office, she contacted Davis about the cracked windshield on her husband's truck. Celia Gardner testified that Davis told her that State Farm would repair the windshield. However, Celia Gardner testified that "we just never did take [the truck] in [for repairs] because, you know, he had gone in to pay the policy." Celia Gardner stated that the Gardners had not contacted anyone else at State Farm about having the windshield repaired.
I cannot agree that the Gardners have suffered damage merely because they obtained another insurance policy or because they "elected" not to file a claim for coverage for the cracked windshield. 842 So.2d at 10. Neither Celia Gardner nor Paul Gardner testified that a State Farm employee informed them they had no insurance coverage. Rather, the State Farm employee asked for the Gardners' documentation regarding their payments.
"In the absence of express and controlling contract or statutory provision, premiums on ordinary insurance policies may be paid to the insurer itself or to its authorized agent, since, if an agent has express, or is clothed with apparent, authority to receive payment of premiums, payment thereof to him by insured is sufficient, and binds the insurer."
George J. Couch, Couch on Insurance 2d § 31.116 (2d ed.1985). Further, the agent's failure to properly submit the Gardners' payments would not affect State Farm's liability to provide insurance coverage:
"Payment to a proper agent of the insurer is sufficient payment although the agent fails to give the insured a receipt therefor or to remit or turn over the money to the insurance company, or to credit the insured with the amount of the payment."
George J. Couch, Couch on Insurance 2d, § 31:125 (2d ed.1985).
*17 The Gardners have failed to establish an essential element of their negligent-supervision claim. I would affirm the trial court's summary judgment in favor of State Farm on all of the Gardners' claims.
NOTES
[1] The breach-of-contract claim against State Farm was later dismissed pursuant to the parties' stipulation.
[2] Before serving in State Farm's Dothan agency field office, Potter had been a State Farm independent contract agent for 16 years and State Farm's agency field executive in Mobile for two years.
[3] In contrast to an independent contract agent, a trainee agent is a salaried employee of State Farm and does not receive commissions; moreover, trainee agents are reimbursed by State Farm for local-office expenses.
[4] Celia Gardner testified that after May 1998, she no longer received a monthly premium bill from State Farm.
[5] It is unclear from the record whether Davis or Sipper was identified as the local employee.
[6] According to Potter, cancellations generally occur at State Farm when insurance applicants misrepresent their loss records or otherwise provide incomplete information to State Farm personnel.
[7] We therefore do not address whether the Gardners' premium payments amounted to funds that are sufficiently specific and capable of being identified so as to support a conversion claim. See generally Willingham v. United Ins. Co., 628 So.2d 328 (Ala.1993). Furthermore, because the Gardners' conversion claim is the sole claim on appeal under which the Gardners seek to affix vicarious liability, as opposed to direct liability, upon State Farm and Snellgrove (see CP & B Enters., Inc. v. Mellert, 762 So.2d 356, 362 (Ala. 2000) (holding that direct and vicarious liability involve distinct issues)), we need not address the circumstances, if any, under which State Farm and Snellgrove might properly have been held to be vicariously liable to the Gardners.